671 F.2d 383
 KENAI OIL AND GAS, INC., a corporation, Bow Valley
Petroleum, Inc., a corporation for themselves and
for all others similarly situated,
Plaintiffs-Appellants,
v.
The DEPARTMENT OF the INTERIOR OF the UNITED STATES; James
G. Watt, individually and as Secretary of the Interior; The
Bureau of Indian Affairs; Thomas Fredricks or his successor,
individually and as Commissioner of the Bureau of Indian
Affairs; Curtis Geiogamah, individually and as Acting Area
Director of Indian Affairs, Phoenix Area; L. W. Collier,
Jr., individually and as Superintendent of the Bureau of
Indian Affairs, Uintah and Ouray Agency; Ute Indian Tribe, a
federal corporation; and Ruby Black, Charles Redfoot, Antone
Appawoo, Floyd Wopsock, Leon Perank, Ouray McCook, Sr.,
individually and as members of the Ute Tribal Council,
Defendants-Appellees,
Reading & Bates Petroleum Co., Amicus Curiae.
 No. 81-2141.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted Nov. 17, 1981.
Decided Feb. 17, 1982.
Rehearing Denied March 16, 1982.
 
 F. Alan Fletcher, Salt Lake City, Utah (Lawrence S. Skiffington, Salt Lake City, Utah, with him on the brief) of Pruitt & Gushee, Salt Lake City, Utah, for plaintiffs-appellants.
 Martin E. Seneca, Jr., Washington, D. C., for defendant-appellee Ute Indian Tribe.
 David C. Shilton, Atty., Dept. of Justice, Washington, D. C. (Carol E. Dinkins, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Francis M. Wikstrom, U. S. Atty., D. Utah, Barbara W. Johnsen, Asst. U. S. Atty., D. Utah, Salt Lake City, Utah, and Anne S. Almy, Atty., Dept. of Justice, Washington, D. C., with him on the brief), for defendant-appellee Dept. of the Interior.
 James C. T. Hardwick, Kent L. Jones and Mark K. Blongewicz of Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, P. C., Tulsa, Okl., for Reading & Bates Petroleum Co. as amicus curiae.
 Before BARRETT, McKAY and LOGAN, Circuit Judges.
 McKAY, Circuit Judge.
 
 
 1
 Appellants are lessees of several oil and gas leases from Ute Indians[1] on lands within the Uintah and Ouray Indian Reservation. The leases were approved by the Bureau of Indian Affairs (BIA) on various dates beginning March 23, 1971. By their terms, the leases would expire ten years from the date of BIA approval unless at that time wells on each lease were producing oil or gas in paying quantities. Prior to the expiration date of the leases, appellants had drilled producing wells on only some of the land leased from the Indians. They had also completed at least one well in March, 1981, on non-tribal land that was within the boundaries of a "communitized area" proposed by lessees. Under a communitization agreement, operations conducted anywhere within the unit area are deemed to occur on each lease within the communitized area and production anywhere within the unit is deemed to be produced from each tract within the unit. Appellants proposed communitization plans in an effort to keep their nonproductive leases on Indian land in effect beyond the primary ten-year lease term by including these nonproductive leases in a communitized area containing at least one producing well.
 
 
 2
 All communitization agreements on restricted Indian land must be approved by the Secretary of the Interior, or his designate, in this case, the Superintendent of the BIA. Appellants' proposed communitization plan was presented to the Superintendent's office shortly before the leases were to expire. The Superintendent refused to approve the proposed communitization agreements because he determined they did not serve the best interests of the Indians. The Superintendent's refusal to approve the proposed agreements would result in immediate expiration of all nonproductive leases at the end of ten years.
 
 
 3
 On March 23, 1981, the date the first nonproductive leases were to expire, lessees filed a complaint in federal district court seeking a declaration that the Superintendent's action was invalid and an injunction ordering the Superintendent to approve the agreements. The district court entered a temporary restraining order suspending the terms of the leases to prevent their immediate expiration pending a decision on the motion for preliminary injunction. After a hearing, the district court denied plaintiffs' motion for preliminary injunction. Thereafter, the district court also denied plaintiffs' motion for an injunction pending appeal, but continued the interim relief for two weeks, to keep the leases in effect while plaintiffs appealed. This court further extended the suspension of the lease terms pending an expedited review of the district court's denial of injunctive relief.
 
 
 4
 It is well settled that the grant or denial of a preliminary injunction is within the sound discretion of the trial court, and may be set aside only if it is based on an error of law or constitutes an abuse of discretion. Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir. 1980). In deciding the motion for preliminary injunction, the district court properly placed the burden on the lessees to establish:
 
 
 5
 (1) (a) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.
 
 
 6
 619 F.2d at 63. The district court determined that the lessees had carried their burden of proof with respect to the last three points, but denied injunctive relief because the lessees had not demonstrated a substantial likelihood that they would eventually prevail on the merits. We agree with the district court's determination that the lessees would be harmed by losing the 1971 leases, that this harm outweighed any potential injury to the defendants, and that an injunction would not be adverse to the public interest. The sole issue on appeal, therefore, is whether the court properly denied injunctive relief based on its determination that lessees had failed to show that they were likely to prevail on the merits.
 
 
 7
 When all other prerequisites to injunctive relief have been established, plaintiff need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation" to satisfy the requirement of showing a likelihood of succeeding on the merits. Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir. 1980) (quoting Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 781-82 (10th Cir. 1964). Clearly, the issues presented in this case are serious and substantial. However, in our opinion, there is little doubt as to the proper resolution of the legal issues involved, and the district court correctly determined that lessees had little, if any, chance of succeeding on the merits of their claim.
 
 
 8
 Approval of communitization agreements is within the discretion of the Secretary of the Interior or his delegate. Section 396d of Title 25 of the United States Code states:
 
 
 9
 All operations under any oil, gas, or other mineral lease issued pursuant to the terms of any act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior. In the discretion of the said Secretary, any lease for oil or gas issued under the provisions of sections 396a-396g of this title shall be made subject to the terms of any reasonable cooperative unit or other plan approved or prescribed by said Secretary prior or subsequent to the issuance of any such lease which involves the development or production of oil or gas from land covered by such lease.
 
 
 10
 (Emphasis added). The regulations promulgated pursuant to this statute require approval of cooperative agreements before they become effective.
 
 
 11
 All such leases shall be subject to any cooperative or unit development plan affecting the leased lands that may be required by the Secretary of the Interior, but no lease shall be included in any cooperative or unit plan without prior approval of the Secretary of the Interior and consent of the Indian tribe affected.
 
 
 12
 25 C.F.R. § 171.21(b) (emphasis added).
 
 
 13
 The district court determined that under these statutory and regulatory provisions, a decision not to approve the communitization agreements was "agency action ... committed to agency discretion by law" pursuant to 5 U.S.C. § 701(a)(2), and hence unreviewable. Alternatively, the court stated that even if the agency action was reviewable, the Superintendent's refusal to approve the communitization agreements was neither arbitrary, capricious nor an abuse of discretion. While we disagree that the Superintendent's actions are not subject to judicial review, we agree that the Superintendent acted within his discretion when he refused to approve the proposed communitization agreements.
 
 
 14
 The Supreme Court has stated that § 701(a)(2) of the Administrative Procedure Act (APA) precludes judicial review "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). This court has recognized that there is a presumption of judicial reviewability, and that exceptions to this general rule are rare. See, e.g., Sabin v. Butz, 515 F.2d 1061, 1065 (10th Cir. 1975); National Helium Corp. v. Morton, 455 F.2d 650, 655 n.12 (10th Cir. 1971). While it is true that 25 U.S.C. § 396d and 25 C.F.R. § 171.21(b) do not detail any specific standards governing the exercise of the Secretary's discretion in approving communitization agreements, those actions nevertheless are limited by the fiduciary responsibilities vested in the United States as trustee of Indian lands. Pursuant to the trust responsibilities of the United States, the Department of the Interior is charged with the administration and supervision of oil and gas leases on restricted tribal lands. 25 U.S.C. §§ 396a-396f. Acting in the capacity as a trustee, the Secretary and his delegate, the Superintendent of the BIA, must manage Indian lands so as to make them profitable for the Indians. As a fiduciary for the Indians, the Secretary is responsible for overseeing the economic interests of Indian lessors, and has a duty to maximize lease revenues. Gray v. Johnson, 395 F.2d 533, 536 (10th Cir.), cert. denied, 392 U.S. 906, 88 S.Ct. 2056, 20 L.Ed.2d 1364 (1968).
 
 
 15
 Appellants agree that the Superintendent's refusal to approve the communitization agreements is discretionary action subject to judicial review. In reviewing this action, therefore, the court's function is to determine whether the Superintendent acted in a manner that was arbitrary, capricious, an abuse of discretion, or contrary to law. 5 U.S.C. § 706(2)(A). If the Superintendent considered all relevant factors in reaching his decision and has made no clear error of judgment, his action cannot be overturned. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); Sabin v. Butz, 515 F.2d 1061, 1067 (10th Cir. 1975). Appellants do not challenge the Superintendent's action as an error of judgment, but rather claim (1) that the Superintendent exceeded the scope of his discretion by basing his decision on economic factors, and (2) that the manner in which the Superintendent reached his decision was procedurally defective.
 
 
 16
 The Superintendent of the BIA testified that he rejected the proposed communitization agreements because he determined they were not in the best economic interests of the Indians. He believed that the leases, which had remained unproductive for nearly ten years, could be re-leased for higher royalty payments and bonuses. Appellants contend that the statutory and regulatory provisions do not vest the Superintendent with discretion to reject communitization agreements for economic reasons, but instead that the Superintendent may act only to the extent necessary to protect and preserve tribal natural resources. In essence, appellants argue that the Superintendent is limited to considering matters involving production and conservation on restricted Indian lands; so long as the communitization agreements are sound in these respects, appellants urge that the Superintendent is duty-bound to approve them. Appellants base their argument largely on the wording of 25 C.F.R. § 171.21(a). This subsection allows the Secretary to impose "such restrictions as to time or times for the drilling of wells and as to the production from any well or wells as in his judgment may be necessary or proper for the protection of the natural resources of the leased land and in the interest of the lessor." (Emphasis added). The regulation states that "(i)n the exercise of his judgment the Secretary of the Interior may take into consideration, among other things ... any regulatory action desired by tribal authorities." The wording of subsection (a) certainly does not expressly preclude the Secretary from considering the Indians' economic interests. The language of subsection (b), which deals with communitization agreements, does not even arguably contain such restrictions. The district court found, and we agree, that this asserted limitation on the Superintendent's discretion "has no basis in the statute or regulation." Kenai Oil and Gas, Inc. v. Department of the Interior, 522 F.Supp. 521 at 534 (D.Utah 1981) (order denying preliminary injunction).
 
 
 17
 Furthermore, limiting the Superintendent's considerations solely to matters of conservation and production would be inconsistent with his trust responsibilities to the Indians in leasing tribal lands. In light of these trust responsibilities, the Superintendent must take the Indians' best interests into account when making any decision involving leases on tribal lands, and has broad discretion to consider all factors affecting their interests. The Superintendent has no obligation to approve a plan which does not serve the Indians' best interests and he has acted within his discretion in refusing to approve an economically unsatisfactory plan. Therefore, appellants' claim that the Superintendent exceeded the scope of allowable discretion has no merit.
 
 
 18
 Appellants also claim that the Superintendent did not sufficiently investigate this matter before making his decision not to approve the communitization agreements. Prior to making his decision, the Superintendent discussed the matter with experts within the Department of Interior and the Solicitor's Office. Appellants claim that he should have taken further steps, such as consulting the Utah State Division of Oil, Gas and Mining and the United States Geological Survey and accumulating more data and information. However, given the fact that appellants waited until shortly before the nonproductive leases were to expire to present their proposal, it is not practical for them to expect greater consultation and deliberation. There is no evidence that suggests the Superintendent's decision was not based on relevant factors, and the record does not reflect any procedural irregularity in the decision-making process, especially considering the circumstances under which the Superintendent was forced by appellants to act.[2]
 
 
 19
 For the first time on appeal, appellants allege that this suit is barred by collateral estoppel, that the Government is estopped from denying approval of the leases, and that the Superintendent's actions violate the National Environmental Policy Act (NEPA). Because these issues were not raised below, they need not be considered on appeal. See, e.g., Nulf v. International Paper Co., 656 F.2d 553, 559 (10th Cir. 1981); Neu v. Grant, 548 F.2d 281, 287 (10th Cir. 1977).[3]
 
 
 20
 In conclusion, we find that the Secretary properly exercised his judgment and discretion in refusing to approve the proposed communitization agreements. Therefore, we agree with the district court that the lessees failed to carry their burden of showing a likelihood of prevailing at trial on the merits of their claim. Approval of the communitization agreements by the Superintendent is a prerequisite to the continued validity of the nonproductive leases in this case. Because the Superintendent did not abuse his discretion in refusing his approval, no purpose is served by keeping the leases in effect through continued extraordinary relief. We are aware that denial of injunctive relief will cause the leases to expire, and thus will moot some of the issues involved in this case. However, the merits of the lessees' claim are so doubtful that further interim relief, which would undoubtedly injure the tribal lessors, is unwarranted. Accordingly, the order of the district court denying injunctive relief is affirmed, and the order of this court suspending the terms of the leases is dissolved. The case is remanded to the district court for further proceedings.
 
 
 21
 AFFIRMED.
 
 BARRETT, Circuit Judge, concurring:
 
 22
 I concur in the opinion based on the specific facts of this case. In doing so, I do not believe that in considering the broad discretion issue, we can permit the Superintendent, simply in light of his trust responsibilities to the Indians, to refuse approval of communitization agreements if he concludes that the Indian lands within the proposed unit will fare better economically "outside".
 
 
 23
 The Secretary does, of course, owe a fiduciary duty to the Indians to secure the best possible lease-operating terms for them. In the case at bar, the lessee waited until the "last minute", so to speak, before submitting the communitization agreement to the Superintendent for review. Superintendent Collier was not provided with geologic data or any development plans by the lessee. He had only two days (over a weekend) to review the agreement. He spoke by phone with his realty office, the Interior's solicitor's office and the Interior's energy and minerals department in Denver. It is unfortunate that the "fuse" with which he was confronted apparently did not permit him to consult with the U.S.G.S., the federal agency with the specific expertise to evaluate the feasibility of a communitization agreement in terms of orderly development for the benefit of all lessors, or the Utah State Division of Oil, Gas and Mining, whose expertise is likewise utilized in determining the feasibility of a communitization agreement.
 
 
 24
 Pooling or communitization of leases is often necessary and advisable to properly explore, develop and operate leased premises in order to promote the conservation of oil and gas. Royalty payments from production are pro-rated among the owners of lands pooled. While initial production will often support pooling, the lessee is under an obligation to reasonably develop all oil and gas underlying the communitized acreage. The respective federal and state agencies have jurisdiction, power and authority to enforce the obligation of reasonable development as dictated by geologic and petroleum engineering expertise. Thus, if action is taken by a lessee in adequate time to afford hearings establishing expert justification of the conservation-development aspects of a specific communitization plan, the fact that the Superintendent foresees the likelihood of realizing a substantial bonus payment with possible enhanced reserved royalty coupled with a drilling commitment from another lessee operating company if he refuses to commit an Indian lease to the unit involved would, in my view, be contrary to the public interest. When a lessee-operator has expended usually large sums in drilling and completing an initial producing well, the lessee is entitled to rely on the pooling covenant in the leases if it is determined that further development is feasible. If a communitization of leases is effected, the lessee-operator is subject to implied covenants to reasonably develop the pooled leases, to protect against drainage, to expeditiously and with reasonable care operate, produce and market and exercise reasonable diligence in the exploration and production of oil and gas underlying the pooled acreage.
 
 
 
 [1]
 Because of the scanty evidence available at the preliminary injunction hearing, the district court was unable to determine with certainty whether the tribal organization or tribal corporation was the lessor. This determination is significant because if the tribal organization is the lessor, it may be sovereignly immune from suit. However, appellants have also stated claims against various governmental agencies and officials which are primarily involved at this stage of the litigation, and thus it is unnecessary for this court to determine precisely who was the lessor, or to consider the sovereign immunity issue
 
 
 [2]
 Appellants also assert that the Superintendent's action amounts to rulemaking under the APA, and thus is subject to the requirements of published notice and comment. 5 U.S.C. § 553; 43 C.F.R. §§ 14.1-14.8. However, in our opinion, the Superintendent's exercise of his discretion not to approve a particular proposal that is based on relevant considerations is not a rule under the APA, which is defined as "a statement of general or particular applicability and future effect which implements, interprets or prescribes law or policy or describes the organization, procedure or practice requirements of the Department." 43 U.S.C. § 14.2(e) (promulgated pursuant to 5 U.S.C. § 551(4))
 
 
 [3]
 In any event, none of these issues appears to have merit. Appellants base their claim of collateral estoppel on Sanguine, Ltd. v. Department of the Interior, No. CIV-81-917-E (W.D.Okla. July 9, 1981). This case involved a challenge to the Superintendent's conditioning approval of communitization agreements upon a requirement that the lessees waive or forfeit rights held under the lease. This is not the same issue presented in this case
 Appellants argue that they have relied on a longstanding BIA practice of approving communitization agreements, and thus the Government is estopped from changing that practice. To accept this argument would effectively nullify the Superintendent's discretion, and would require the BIA to rubber-stamp approval of any proposal submitted. We also do not agree that the Superintendent's action retroactively extinguishes lessees' rights under the leases. The primary lease terms were for ten years, unless the leases were producing oil or gas. None of the leases in question was producing when the ten-year period expired. We also disagree that the Superintendent was acting in bad faith to obstruct lease operations. Instead, the Superintendent's actions were consistent with his fiduciary duties to the Indians.
 Finally, the Secretary's decision not to approve the leases does not rise to the level of a federal action which "affect(s) the quality of the human environment ...." 42 U.S.C. § 4332(2)(C), so as to require an environmental assessment under NEPA.