966 F.2d 583
 CHEYENNE-ARAPAHO TRIBES OF OKLAHOMA, Plaintiff-Appellee and
Cross-Appellant,
v.
The UNITED STATES of America; the Department of the
Interior; William P. Clark, Individually and as Secretary
of the Interior; William P. Ragsdale, Individually and as
Area Director, Anadarko Area Office, Bureau of Indian
Affairs; Tom Dowell, Individually and as Superintendent,
Concho Indian Agency, Bureau of Indian Affairs, Defendants,
and
The Woods Petroleum Corporation, Defendant-Appellant and
Cross-Appellee.
 Nos. 89-6270, 89-6355.
 United States Court of Appeals,
Tenth Circuit.
 June 5, 1992.
 
 1
 Robert T. Anderson of the Native American Rights Funds, Boulder, Colo. (Patrice Kunesh-Hartman and Yvonne T. Knight with him on the brief), for plaintiff-appellee and cross-appellant.
 
 
 2
 Kent L. Jones of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Okl. (Orval E. Jones with him on the brief), for defendant-appellant and cross-appellee.
 
 
 3
 Before ANDERSON and BRORBY, Circuit Judges, and BRIMMER, Chief District Judge.*
 
 
 4
 BRIMMER, Chief District Judge.
 
 
 5
 This action seeking judicial review of the decision of a federal agency was initiated by the plaintiff, Cheyenne-Arapaho Tribes of Oklahoma (hereinafter "Tribe") on July 17, 1984. Jurisdiction of the district court was based upon 28 U.S.C. §§ 1331 and 1362.[1] This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1292(b)[2]. The district court certified its order for appeal on May 26, 1989. This Court granted appellant Woods Petroleum Corporation's (hereinafter Woods) petition to take an interlocutory appeal on July 24, 1989, and Tribe's petition for cross-appeal on October 20, 1989. The United States did not take an interlocutory appeal.
 
 Background
 
 6
 The district court's summary judgment ruling overturned the Bureau of Indian Affairs' (hereinafter BIA) 1981 decision to approve two communitization agreements unitizing oil and gas operations on two 640-acre spacing units (Sections 29 and 32) owned by the Tribe in Custer County, Oklahoma. Woods had four oil and gas leases in Sections 29 and 32, each covering 160 acres, which were approved by the Concho Agency Superintendent on May 10, 1976.[3] Reading and Bates Petroleum Company acquired two leases covering 160 acres each in Sections 29 and 32 on February 22, 1980.[4] The primary term of each lease was for 5 years and as much longer thereafter as oil and/or gas was produced in paying quantities. Each of the 1976 leases contained a commence drilling clause, which purported to extend the lease if drilling was commenced during the primary term.
 
 
 7
 Each lease also contained a unit operation clause (hereinafter Clause 9) which dealt with communitization[5] by providing that:
 
 
 8
 The parties hereto agree to subscribe to and abide by any agreement for the cooperative or unit development of the field or area, affecting the lease lands, or any pool thereof, if and when collectively adopted by a majority operating interest therein and approved by the Secretary of the Interior, during the period of supervision.
 
 
 9
 Under a communitization agreement, drilling operations conducted anywhere within the unit area are deemed to occur on each lease within the communitized area and production anywhere within the unit is considered to be produced from each tract within the unit. Kenai Oil & Gas, Inc. v. Dept. of Int. of U.S., 671 F.2d 383, 384 (10th Cir.1982). Communitization agreements formed pursuant to Clause 9, in conjunction with the commence drilling clause, thus extend the terms of all the leases if drilling is commenced on any lease within the units covered by the agreements.
 
 
 10
 Since the five year leases signed in 1976 would have expired on May 10, 1981, a flurry of activity occurred among the lessees prior to that date. Woods and Reading and Bates, as owners of the leases in sections 29 and 32, agreed on April 1, 1981 to communitize the tracts and leases in each section for unitized drilling and production. The communitization agreements designated Reading and Bates as the operator of the unit wells in both sections. Reading and Bates Petroleum Company requested the Tribe's approval of the proposed communitization agreements by letter dated April 15, 1981. The USGS issued a permit on April 22, 1981 authorizing Reading & Bates to commence drilling operations in Section 32. On April 22 and April 23, 1981, the chairman of the Tribe's business committee and the Tribe's business manager met with the Reading and Bates representative and officials from the Anadarko Area Office of the BIA and explained that they would not agree to the communitization agreements unless the 1976 leases were renegotiated. Tribal officials requested a lease bonus of $1500 per acre as well as a ten percent back-in working interest in the Woods leases. Reading and Bates rejected any renegotiations of the Woods leases on May 1, 1981.
 
 
 11
 By letter dated May 1, 1981, Reading and Bates demanded that the Tribe assent to the communitization agreements. The letter stated that in the event the leases were lost, Reading and Bates would "pursue every legal remedy" in order to receive restitution for the losses that it might sustain.[6] On May 5, 1981, Reading and Bates submitted the proposed communitization agreement to the United States Geological Survey (USGS) for approval. The USGS recommended approval of both agreements on the basis that they appeared to offer adequate protection to the restricted Indian interests. On May 8, 1981, the Acting Area Director of the Anadarko Office of the BIA approved both communitization agreements.
 
 
 12
 On August 5, 1981, the Tribe filed a notice of appeal of the Area Director's decision to approve the communitization agreements. Subsequently, on February 9, 1982, the Deputy Assistant Secretary of the Department of the Interior affirmed the Acting Area Director's decision. The Tribe then appealed this decision to the BIA. On February 10, 1983, the BIA entered an order affirming the Anadarko Director's decision. The BIA then granted the Tribe's petition for rehearing and called for supplementation of the record so that the reasons for the Area Director's approval of the agreements could be set forth in more detail. Upon consideration of supplemental materials, the BIA entered an order on May 18, 1984 reaffirming the Area Director's May 1981 decision to approve the communitization agreements.
 
 
 13
 The Tribe then commenced an action in the United States District Court for the Western District of Oklahoma. The fundamental issue before the district court was whether the BIA's approval of the communitization agreements extended the primary terms of certain leases on the Tribe's land. Subsequently, summary judgment motions were filed by the parties. Upon review of the record, the district court concluded that the administrative record was inadequate to resolve the issues raised. The court remanded the case to the Secretary of the Interior with instructions to respond to particular questions presented by the court. After the Secretary entered his response to the Order of Remand, the parties filed a second round of summary judgment motions. This appeal is from the order on those motions.
 
 
 14
 In the action below, Woods contended that the issues raised by the Tribe were not properly before the district court because the Tribe's administrative appeal of the approval of the communitization agreements was not timely. The court below disagreed, finding that the Tribe did not receive written notice as per 25 C.F.R. § 2.4, and concluding that the Tribe's filing of its appeal on August 5, 1981 was not untimely under 25 C.F.R. § 2.10. In addition, the district court found that Woods failed to demonstrate that it had been prejudiced by the delay in the filing of the Tribe's appeal. Since the Tribe's administrative appeal was timely, the district court declared that the issues raised by the Tribe were properly before it.
 
 
 15
 The district court found that the record did not establish that the parties to the 1976 leases intended Clause 9 (the unit operation clause) to require particularized tribal consent to each communitization agreement. The court analyzed the language of Clause 9, and found that the provision constituted a blanket consent to future communitization agreements. There was no finding of a fundamental conflict between the blanket consent interpretation of Clause 9 and the policies underlying the Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a to 396g (hereinafter MLA). In addition, the district court interpreted the law existing in 1976 when the leases were executed as supporting the blanket consent interpretation of Clause 9. The court concluded that lack of Tribal consent did not invalidate the communitization agreements. The district court also found that the Area Director breached his trust responsibility to the Tribe under the MLA by approving the communitization agreements without studying the economic conditions prevailing at the time. As a result of this breach of trust, the court held that the communitization agreements did not extend the non-drilling 1976 leases, and those leases thus expired at the end of their primary terms. The district court denied the Tribe's cross-motion for partial summary judgment on the issue of whether the Woods' leases violated the MLA, holding that the commence drilling clauses of the leases operated to extend those leases if drilling was commenced during the primary term set forth in the habendum clauses. The court denied the Tribe's cross motion for summary judgment on the issue of whether Woods' leases were amended by the communitization agreements to condition extension beyond their primary terms on production rather than drilling, on the basis that the matter had not been properly raised at the administrative level.
 
 
 16
 As a result of the court's ruling, three leases on which no drilling occurred during their primary terms expired on May 10, 1981.[7] Consequently, as of May 10, 1981, the Tribe was the rightful owner of all the working interest and the royalty interest in those tracts, and was thus entitled to certain revenues attributable to the tracts after May 10, 1981.
 
 Appellate Contentions
 
 17
 On appeal, Woods contends that (1) the administrative appeal of the Tribe was not timely, and that (2) the district court improperly substituted its own economic judgment for that of the Department in determining whether or not to approve the communitization agreements.
 
 
 18
 In discounting Woods' argument that the Tribe's appeal of the administrative action was not timely, the Tribe notes that it never received formal written notice of the adverse administrative action as required by 25 C.F.R. § 2.4. The Tribe replies that the district court was correct in its ruling that the Secretary of the Interior breached his trust responsibility to the Tribe by failing to consider current economic conditions prior to approving the communitization agreements. The Tribe also contends that the district court's interpretation of Clause 9 is inconsistent with the intent and purpose of the Mineral Leasing Act to maximize tribal control. In addition, the Tribe claims that all four leases expired for failure to achieve production in paying quantities before the end of the primary term because the commence drilling clause is in conflict with MLA and, thus, unlawful.
 
 
 19
 Since our ruling on Woods' contentions will effectively dispose of this action, the Court will address its opinion only to the timeliness issue and the question of whether the Secretary should have considered economic factors.
 
 I.
 Standard of Review
 
 20
 The Circuit Court of Appeals reviews the district court's grant or denial of a summary judgment motion by applying the same legal standard employed by the district court under Rule 56(c) of the Federal Rules of Civil Procedure. Gray v. Phillips Petroleum Co., 858 F.2d 610, 613 (10th Cir.1988); Osgood v. State Farm Mut. Auto. Ins. Co., 848 F.2d 141, 143 (10th Cir.1988). Summary judgment should be granted, and will be affirmed, only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In applying this standard, the court must examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Gray v. Phillips Petroleum Co., 858 F.2d at 613. The standard provides that the mere existence of some factual dispute will not frustrate an otherwise proper summary judgement. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).
 
 
 21
 The court must decide if the substantive law was correctly applied. Osgood v. State Farm Mut. Auto. Ins. Co., 848 F.2d at 143. The appellate court applies a de novo standard of review to all legal determinations made by the district court. Goichman v. City of Aspen, 859 F.2d 1466, 1467 (10th Cir.1988). The court may affirm the grant or denial of summary judgment if any proper ground exists to support the lower court's ruling. Id. at 1468. Affirmance of summary judgment need not be based on the grounds relied upon by the district court, but may be based on any proper grounds for which the record is sufficient to permit conclusions of law. Griess v. Colorado, 841 F.2d 1042, 1047 (10th Cir.1988).
 
 II.
 
 22
 Was the Administrative Appeal Timely?
 
 
 23
 Woods contends that the district court should have dismissed the Tribe's claims for failure to commence the administrative appeal within the mandatory thirty-day period prescribed by regulation. The communitization agreements at issue in this case were approved by the Anadarko Area Office on May 8, 1981. The Tribe did not file its administrative appeal until August 5, 1981. Woods argues that the Tribe knew that the agreements had been approved, and yet indulged in a prejudicial delay of 89 days before filing the appeal.[8] Woods claims that the Tribe received actual, personal notice of the decision from Reading and Bates on May 9, 1981 and had received copies of the communitization agreements prior to May 9.
 
 
 24
 The record reflects, however, that the Tribe did not receive notice in writing given by the official making the decision or taking the action. Pursuant to 25 C.F.R. § 2.4, failure to give such notice extends the time in which appeal from the decision may be taken.[9] The regulation is explicit: when proper notice has not been given, the right to appeal continues until such notice is received. The Tribe's appeal was timely.
 
 III.
 
 25
 Should the Secretary Have Considered Economic Factors?
 
 
 26
 The proper function of courts when reviewing an administrative order is to assure that the relevant factors were considered by the agency and that the decisionmaker made no clear error of judgment. Kenai Oil & Gas, Inc. v. Department of Interior, 671 F.2d 383, 386 (10th Cir.1982). Appellant Woods claims that the district court abused that function by (1) substituting its own views for those of the agency upon economic judgments within the discretion of the agency, and by (2) considering irrelevant factors. We disagree with both contentions.
 
 
 27
 Approval of communitization agreements falls within the discretion of the Secretary of the Interior pursuant to 25 U.S.C. § 396d, which states that:
 
 
 28
 All operations under any oil, gas, or other mineral lease issued pursuant to the terms of any act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior. In the discretion of the said Secretary, any lease for oil or gas issued under the provisions of sections 396a-396g of this title shall be made subject to the terms of any reasonable cooperative unit or other plan approved or prescribed by said Secretary prior or subsequent to the issuance of any such lease which involves the development or production of oil or gas from land covered by such lease.
 
 
 29
 Regulations concerning leases on restricted Indian lands require the Secretary's approval of cooperative agreements:
 
 
 30
 All such leases shall be subject to any cooperative or unit development plan affecting the leased lands that may be required by the Secretary of the Interior, but no lease shall be included in any cooperative or unit plan without prior approval of the Secretary of the Interior and consent of the Indian tribe affected.
 
 
 31
 25 C.F.R. § 171.21(b) (now § 211.21(b)).
 
 
 32
 Although 25 U.S.C. § 396d and 25 C.F.R. § 211.21(b) do not so expressly state, the United States' function as a trustee over Indian lands necessarily limits the Secretary's discretion to approve communitization agreements. Even in the absence of express language about a trust fund, a trust, or a fiduciary connection, when the Government controls tribal monies or properties, a fiduciary relationship normally exists with respect to those monies or properties. Navajo Tribe of Indians v. United States, 624 F.2d 981, 987, 224 Ct.Cl. 171 (1980). The United States Supreme Court has stated that:
 
 
 33
 [A] fiduciary relationship necessarily arises when the Government assumes ... elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds).
 
 
 34
 United States v. Mitchell, 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983). The Supreme Court noted in Mitchell that the existence of a general trust relationship between the United States and the Indian people is undisputed. Id. at 225, 103 S.Ct. at 2972.
 
 
 35
 Mitchell deals with holding the United States accountable in money damages for alleged breaches of trust in connection with management of forest resources, and the underlying message clearly establishes the existence of a fiduciary relationship when statutes and regulations give the Federal Government a pervasive role in management of Indian properties. Id. at 224, 103 S.Ct. at 2971-72. There can be no question that 25 U.S.C. § 396d relegates control of oil and gas leases on Indian lands to the Secretary of the Interior. See Jicarilla Apache Tribe v. Supron Energy, 728 F.2d 1555, 1563 (10th Cir.1984), (Seymour, J., concurring in part and dissenting in part), dissenting opinion adopted as the majority opinion as modified, 782 F.2d 855 (10th Cir.1986) (en banc); Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation v. The Board of Oil and Gas Conservation of the State of Montana, 792 F.2d 782, 794 (9th Cir.1986); and Blackfeet Tribe of Indians v. Montana, 729 F.2d 1192, 1199 & n. 18 (9th Cir.1984) (en banc), aff'd, 471 U.S. 579, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). Therefore, the Secretary's discretion to approve or disapprove leases and communitization agreements must be governed by fiduciary standards and limited by fiduciary duties.
 
 
 36
 Since the Secretary's discretion is limited by the fiduciary responsibilities vested in the United States as trustee of Indian lands and as the supervisor and administrator of oil and gas leases on those lands, the following holds true:
 
 
 37
 Acting in the capacity as a trustee, the Secretary and his delegate, the Superintendent of the BIA, must manage Indian lands so as to make them profitable for the Indians. As a fiduciary for the Indians, the Secretary is responsible for overseeing the economic interests of Indian lessors, and has a duty to maximize lease revenues.
 
 
 38
 Kenai, 671 F.2d at 386, citing Gray v. Johnson, 395 F.2d 533, 536 (10th Cir.1968), cert. denied, 392 U.S. 906, 88 S.Ct. 2056, 20 L.Ed.2d 1364 (1968). "If the Superintendent considered all relevant factors in reaching his decision and has made no clear error of judgment, his action cannot be overturned." Kenai at 386, citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971). See also Sabin v. Butz, 515 F.2d 1061, 1067 (10th Cir.1975). The issues decided in the district court and now before this Court are if a genuine issue of material fact exists as to whether the Secretary considered all the factors relevant to a fiduciary's decision and whether the Secretary complied with his duty to maximize lease revenues when he approved the communitization agreements.
 
 
 39
 The district court remanded the case to the Secretary for further explanation of the reasons underlying the approval of the communitization agreements. A review of the record indicates that the Secretary's response to the Order of Remand included economic benefit for the Tribe as one justification for approval of the communitization agreements. The record shows, however, that the Area Director, as the Secretary's delegate, did not consider all the relevant economic factors. The Secretary acknowledged in his response that the Acting Area Director of the Anadarko Office of the BIA "did not consider any evidence of the market value and marketability of the new lease."[10]
 
 
 40
 Unusual conditions existed in the Anadarko area in the early 1980's. The record establishes that the Area Director reported to the Secretary that deep gas discovery in the Anadarko area had prompted a short period of astronomical bids on advertised mineral tracts. A comparison of lease bonuses obtained by the Tribe on the various tracts located in Sections 29 and 32 shows that for each of the 1976 leases at issue, the Tribe received a bonus of thirty-five dollars per acre and a royalty rate of sixteen and two-thirds percent.[11] By contrast, the two 1980 leases to Reading and Bates yielded a bonus to the Tribe of two hundred and thirty-five dollars an acre and a royalty rate of twenty percent on one tract, and a bonus of three hundred and fifteen dollars per acre and a twenty percent royalty rate on the other tract.[12]
 
 
 41
 The Secretary stated that the bonus paid when Woods acquired the oil and gas leases was compensation for the right to develop the leasehold for a specified term of years, and because the Indian leases were still in their primary terms at the time the communitization agreements were approved, there was no reason to require an evaluation of the market value and marketability of the leases in 1981. According to the Secretary, disapproval of the communitization agreements and failure to communitize the unit would have resulted in losing several leases, and it was unlikely that new leases would have been negotiated. The Secretary explained that, since the losing lessees would probably have resorted to retaliatory litigation, "It was the Area's belief that no lessee would be willing to risk leasing any of the tracts that were involved in litigation or were de-spaced. Thus the Area did not believe that the Tribe would receive any increased revenues from re-leasing."[13] Relying on such a justification would, however, result in across-the-board approvals of communitization agreements. The threat of litigation may be intimidating, but careful analysis of relevant factors takes precedence over avoiding a lawsuit.
 
 
 42
 The Secretary and his delegates acted inconsistently with fiduciary responsibilities owed to Indian mineral interest owners. In light of the Anadarko Area conditions and the market for oil and gas, the conclusions reached as to the market value and marketability of leases prior to the boom period of 1980 and 1981 should have been reconsidered. After reviewing the record, this Court agrees with the district court that the trust responsibilities to the Tribe were uncontrovertedly breached by failure to examine all relevant factors before approving the agreement.
 
 
 43
 Factors relevant to an agency's decision to approve communitization agreements were discussed by this Court in Kenai, supra, which involved the Secretary's refusal to approve communitization agreements. In Kenai we held that:
 
 
 44
 ... limiting the Superintendent's considerations solely to matters of conservation and production would be inconsistent with his trust responsibilities to the Indians in leasing tribal lands. In light of these trust responsibilities, the Superintendent must take the Indians' best interests into account when making any decision involving leases on tribal lands, and has broad discretion to consider all factors affecting their interests. The Superintendent has no obligation to approve a plan which does not serve the Indians' best interests and he has acted within his discretion in refusing to approve an economically unsatisfactory plan.
 
 
 45
 Kenai, 671 F.2d at 387. Appellant Woods claims that the fact that unitized development is indisputably proper sufficiently supports the Secretary's economic judgment to approve communitization. Woods contends that the quintessential component of communitization of leases is whether the proposed plan is reasonable and appropriate for the purpose of proper development and conservation of natural mineral resources. Since the proposed plan was reasonable and appropriate, Woods argues, the Secretary's approval was within his discretion.
 
 
 46
 Appellant's argument completely ignores the fiduciary relationship between the Secretary and the Tribe. When the Secretary is obligated, as in this case, to act as a fiduciary, "then his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under more stringent standards demanded of a fiduciary." Jicarilla, 728 F.2d at 1563. The Area Director, as a delegate of the Secretary of the Interior, has broad administrative discretion to consider all factors affecting the Tribe's interests, but his fiduciary responsibilities do not allow such discretion when it comes to not considering certain factors. The Area Director was not free to conclude, without some consideration of the present market conditions, that new leases would be as difficult to negotiate as they would have been in pre-boom times. Absent consideration of current market developments, the Area Director's conclusion that he could not protect the Tribe's economic interests if the communitization agreements were disapproved was inconsistent with the agency's fiduciary obligations to the Tribe, and seems more consistent with a policy of blanket approval than with a policy of maximizing tribe revenues.[14]
 
 
 47
 In this instance, the Secretary and his delegates should have considered the economic realities of an oil and gas lease in the Anadarko region in the early 1980's as compared to 1976. The failure to do so was arbitrary, capricious and an abuse of discretion. This Court finds that the district court correctly applied the substantive law in determining that the Secretary and his delegates breached their fiduciary responsibilities to the Tribe.
 
 IV.
 Summary
 
 48
 In conclusion, we find that the Tribe's administrative appeal was timely. We also find that the Secretary and his delegates breached their fiduciary responsibilities to the Tribe by failing to consider the market conditions in the Anadarko Area during the early 1980's. We agree with the district court that such conditions were factors relevant to the agency's decision, and failure to consider them therefore constitutes an arbitrary and capricious abuse of discretion by the Secretary and his delegates. Because the Secretary abused his discretion, the communitization agreements are not valid, and the leases upon which drilling had not commenced as of May 10, 1981 expired on that date. Accordingly, the order of the district court granting summary judgment to the Tribe is AFFIRMED.
 
 
 
 *
 Honorable Clarence A. Brimmer, Chief U.S. District Judge for the District of Wyoming, sitting by designation
 
 
 [1]
 28 U.S.C. § 1362 gives original jurisdiction to all civil actions brought by any recognized Indian tribe. As per the Tribe's complaint, its claims fall under the Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a to 396g; the Administrative Procedure Act, 5 U.S.C. §§ 701 to 706; the due process clause of the Fifth Amendment to the Constitution of the United States; and certain regulations of the United States Department of the Interior ("Department")
 
 
 [2]
 28 U.S.C. § 1292 allows interlocutory orders to be appealed in the discretion of the district court. The interlocutory order appealed from in this case was a partial grant and partial denial of summary judgment to the Tribe
 
 
 [3]
 The Woods leases in Custer County, Oklahoma were Number 14-20-205-6895, covering the NE/4, section 32-14N-20W; Number 14-20-205-6896, covering the NW/4, section 32-14N-20W; Number 14-20-205-6897, covering the SE/4, section 32-14N-20W; and Number 14-20-205-6894, covering the SW/4, section 29-14N-20W
 
 
 [4]
 The Reading and Bates Leases were Number 14-20-205-7672, covering the NE/4, section 29-14N-20W and Number 14-20-205-7675, covering the SW/4, section 32-14N-20W
 
 
 [5]
 The terms communitization and unitization are used synonymously in this opinion
 
 
 [6]
 Ad. Rec. at 678
 
 
 [7]
 Those leases were Numbers 14-20-205-6894, 14-20-205-6895 and 14-20-205-6897
 
 
 [8]
 There is no evidence in the record to indicate how, or indeed if, Woods was prejudiced
 
 
 [9]
 The 1981 text of 25 C.F.R. § 2.4 read in part:
 This notice shall be in writing and shall be given by the official making the decision or taking the action. Failure to give such notice shall not affect the validity of the action or decision, but the right to appeal therefrom shall continue under the regulation.
 
 
 [10]
 See Attachments to Appellee's Response to Appellant's Opening Brief, Tab 2 at 8
 
 
 [11]
 See Attachments to Appellee's Response to Appellant's Opening Brief, Tab 2 at 7
 
 
 [12]
 Id
 
 
 [13]
 See Attachments, Appellee's Response to Appellant's Opening Brief, Tab 2 at 10
 
 
 [14]
 Woods claims that the Secretary cannot disapprove communitization agreements for the sole purpose of allowing the underlying leases to lapse so that the Tribe may gain revenues by re-leasing. See Cotton Petroleum Corp. v. United States Dep't of the Interior, 870 F.2d 1515, 1527-28 (10th Cir.1989). Woods' claim is consistent with Cotton, in which we refused to defer to the Secretary's decision since he considered only economic factors, rather than all relevant factors. Id. at 1527-28. This is not a Cotton situation, however: although our holding today has the ultimate effect of denying the communitization agreements, that effect is merely the aftermath of the Secretary's failure to consider the prerequisite relevant economic factors in his decision to approve the agreements. As per Kenai, our opinion is that those economic factors were indeed relevant and should have been considered. 671 F.2d at 387. In Kenai, we deferred to the Secretary's decision because he considered economic, conservation and production factors. Id. However, in the case at bar, as in Cotton, we cannot defer since the Secretary did not consider all relevant factors