18 F.3d 854
 WOODS PETROLEUM CORPORATION, Ratex Resources Incorporated,
Midcon Central Exploration Company, Mustang
Production Company, Plaintiffs-Appellants,
v.
UNITED STATES DEPARTMENT OF the INTERIOR; Bureau of Indian
Affairs; Timothy Nibs; Wisdom A. Nibs, Jr.; Reginald R.
Nibs; Ronald Leroy Nibs; Elaine Shirley Nibs Mayes; D'Ann
Nibs; Lowell Nibs; Theodore Raymond Nibs; Wisdom Nibs,
Sr.; Brenda Tonips Nibs; Michael Nibs; Leroy Stoneroad;
Vitro Stoneroad; Solomon Stoneroad; Eleanor Joy Stoneroad;
Joe Hicks, Anna B. Twins Spottedwolf; Patrick B.
Spottedwolf; Lucian M. Twins; Joyce M. Twins; Minita
Twins Runningwater; Wesley Robert Twins; Lucinda Amelia
Sweetwater; Mariam Mann Twins; Wesley Robert Twins;
McClain H. Twins, Jr.; Marion M. Twins, Michael Wayne
Twins; Tomlinson Properties, Inc., Defendants-Appellees.
 No. 92-6053.
 United States Court of Appeals,
Tenth Circuit.
 March 7, 1994.
 
 1
 Donald L. Kahl (Orval E. Jones, with him on the brief), Hall Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, for plaintiffs-appellants.
 
 
 2
 Dirk D. Snel (Roger Clegg, Acting Asst. Atty. Gen., Gerald S. Fish and David C. Shilton, U.S. Dept. of Justice, Washington, DC and Timothy D. Leonard, U.S. Atty., and M. Kent Anderson, Asst. U.S. Atty., Oklahoma City, OK, with him on the brief), U.S. Dept. of Justice, Washington, DC, for defendants-appellees U.S. Dept. of the Interior and Bureau of Indian Affairs.
 
 
 3
 Steven L. Barghols (Jay C. Jimerson, with him on the brief), Mock, Schwabe, Waldo, Elder, Reeves & Bryant, Oklahoma City, OK, for defendant-appellee Tomlinson Properties, Inc.
 
 
 4
 Amos E. Black, III, Anadarko, OK, for defendants-appellees Anna Twins Spottedwolf, Eleanor Stoneroad, Victor Stoneroad, and Leroy Stoneroad.
 
 
 5
 Before EBEL and McWILLIAMS, Circuit Judges, and OWEN, District Judge.*
 
 
 6
 OWEN, District Judge.
 
 
 7
 On this appeal, we are again called upon to address and resolve the tensions arising from the confluence of a number of legitimate interests: 1) the right of a state to establish drilling units to control the development of its oil resources; 2) the duty of the United States Department of the Interior to protect and maximize the return to Indians from their allotted lands; 3) the contractual rights of oil-producing companies such as plaintiffs, which commit millions of dollars in drilling costs in reliance on provisions in leases executed with both Indian and non-Indian landowners with full knowledge of the Department of the Interior, and 4) the expectations of all lessees of a state-mandated drilling unit to receive approval from the Secretary of the Interior as to Indian leases of a duly-executed communitization agreement allocating proportional revenues from oil production to each tract in the drilling unit regardless of whether or not a producing well is drilled on a particular tract within the unit or not.
 
 
 8
 Woods Petroleum Corporation and other oil companies (hereafter variously "plaintiffs" and/or "appellants") commenced this action on July 28, 1986 challenging the validity of an administrative order issued by the Assistant Secretary for Indian Affairs in the Department of the Interior (the "Secretary"). The Secretary's order had rejected an agreement to communitize Indian and non-Indian mineral interests for oil and gas drilling and production in a concededly-proper Oklahoma 640-acre drilling and spacing unit. The Woods plaintiffs sought a judgment vacating the Secretary's administrative order and a decree quieting their title in Indian leases that had ostensibly expired for lack of development. Jurisdiction of the District Court was based on 28 U.S.C. Secs. 1331 and 1361. Appellate jurisdiction is conferred by 28 U.S.C. Sec. 1291.
 
 
 9
 The history of this proceeding is as follows. In 1977, the Concho Agency Superintendent ("Superintendent") of the Bureau of Indian Affairs ("BIA") approved three oil and gas leases from Indian lessors to lessee National Cooperative Refinery Association, covering certain restricted Indian allotments (the Indian leases) totalling 117.5 net mineral acres in Custer County, Oklahoma. Plaintiffs, by assignment, succeeded to National's interest in the said tracts, which are located in Section 17, Township 12 North, Range 17 West, Custer County. On May 18, 1979, the Oklahoma Corporation Commission[1] (the "Commission") established the 640-acre section constituting Section 17 as a state-ordered drilling and spacing unit.
 
 
 10
 The said 1977 Indian leases to plaintiffs' assignor granted an exclusive right, for a primary term of five years, to drill for, extract and dispose of all oil and gas underlying the leased tracts. Assuming drilling commenced within the primary term, these leases also granted an exclusive right to a second term continuing for "as much longer thereafter as oil and/or gas is produced in paying quantities" from a well so drilled. The leases also contained a unit operations clause providing that the parties shall abide by "any agreement for the cooperative or unit development of the ... area, affecting the leased lands, ... if and when collectively adopted by a majority operating interest therein and approved by the Secretary of the Interior...."
 
 
 11
 On December 1, 1981, plaintiff Woods Petroleum executed and circulated among all the working interest owners in Section 17 an agreement voluntarily pooling the Indian interests with the non-Indian interests in the 640-acre communitized area, to become effective as of January 2, 1982. All working interest owners in the unit area executed the agreement. Under a communitization agreement, "drilling operations conducted anywhere within the unit area are deemed to occur on each lease within the communitized area and production anywhere within the unit is considered to be produced from each tract within the unit." Cheyenne-Arapaho Tribes of Oklahoma v. United States, 966 F.2d 583, 585 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1642, 123 L.Ed.2d 265 (1993), citing Kenai Oil & Gas, Inc. v. Department of Interior, 671 F.2d 383 (10th Cir.1982).
 
 
 12
 On January 5, 1982, nearly two months prior to the end of the primary term of any Indian lease within the unit, Woods commenced drilling a unit well on a non-Indian tract within the unit. On February 17, 1982, also before the primary terms of the 1977 leases were due to expire, plaintiffs submitted to the Department of the Interior (the "Department") a fully-executed communitization agreement for approval in order to communitize all interests within the unit. The Communitization Agreement was approved by the Anadarko Area Director ("Area Director") on April 12, 1982.[2]
 
 
 13
 On September 6, 1983, the Indian defendants administratively appealed the Area Director's approval of the agreement, arguing that the approval of the Agreement was a breach of the BIA's trust responsibility because the power of the Area Director to approve the agreement expired at the end of the primary lease term. In December, 1985, the Secretary instructed the BIA to prepare a "best interest assessment" in accordance with this Court's decision in Kenai, supra. The BIA found that, under the market and economic conditions of that time, separate development of the Indian interests might not be feasible, and that the prospect of the Indians receiving future royalties from production was not guaranteed.
 
 
 14
 The Secretary neither considered nor addressed the BIA's concerns in the study he had instituted. He also failed to determine that any part of the Communitization Agreement was economically unsatisfactory or contrary to the contractual expectations of the parties to the 1977 leases. However, the Secretary reversed the Area Director's approval of the Communitization agreement, holding that it would be in the best interest of the Indian defendants to receive both a new lease bonus and a royalty.
 
 
 15
 In so holding, the Secretary did not address Woods' contention that excluding the Indian interests from the communitized area should also then preclude them from sharing in any unit revenue. Rather, he attempted to justify his order by observing that there was a potential lessee in the wings which would pay $400,000 to acquire the Indian mineral interest if the 1977 leases were not communitized, and thereby expired.
 
 
 16
 Consequently, on May 15, 1986, the Secretary issued an order declaring that the Indian leases had expired and ordering the issuance of new leases. The Area Director accordingly approved the new lease between the Indian lessors and the new lessee, Tomlinson Properties, Inc. ("Tomlinson"), with an additional $400,000 in lease bonuses. Under the approval, the Indian interests were reinserted into the unit the Secretary had earlier rejected, and were to share unit revenues retroactive to the time of first unit production four years earlier. Tomlinson, it should be noted, has never attempted to obtain permission to separately develop the Indian leases by drilling a well on any tract having an Indian interest.
 
 
 17
 Plaintiffs' complaint in the District Court alleged three claims for relief: that the administrative order rejecting the Communitization Agreement was arbitrary and capricious and an abuse of discretion and should therefore be vacated; that plaintiffs' interests under the 1977 leases should be declared superior to the new leases granted by the Indian defendants to Tomlinson; and that in the event the rejection of the Communitization Agreement should be upheld, plaintiffs should be entitled to a refund of all proceeds of unit production tendered and paid as unit royalties to the Indians under the 1977 leases.
 
 
 18
 On February 28, 1988, the District Court ruled that the administrative order rejecting the Communitization Agreement was valid, and that plaintiffs' 1977 leases had expired because the Indian tracts had been excluded from the drilling unit by the order of the Secretary. On September 29, 1988, the Court further ruled that the Indian defendants and Tomlinson were entitled to receive a share of unit production proceeds as of the date of first unit production. Finally, on December 22, 1988, the District Court ruled that despite the Secretary's exclusion of the Indian tracts from the communitized area, the Indian interests would be treated as if they had remained in the unit, and would be entitled to royalties under Oklahoma law.
 
 
 19
 On this appeal pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. Sec. 701 et seq. appellants argue that our holding in Cotton Petroleum Corporation v. United States Dep't of Interior, 870 F.2d 1515 (10th Cir.1989) is controlling and that accordingly the Secretary's order was an abuse of discretion, contrary to law, arbitrary and capricious, and void under the APA.
 
 
 20
 Under the Administrative Procedure Act, a reviewing court may only set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. Sec. 706(2)(A); Cotton Petroleum U.S. Dep't of Interior, 870 F.2d 1515, 1525 (10th Cir.1989). We must consider whether the Secretary "considered all relevant factors in reaching his decision and has made no clear error of judgment." Kenai Oil & Gas, Inc. v. Department of Interior, 671 F.2d 383, 386 (10th Cir.1982).
 
 
 21
 Appellants contend that the delay of the effective commencement date of communitized development of the Indians' mineral leases wrongfully allowed the Indian interests to retain the economic benefit of this development while freeing themselves of its burdens. They contend that the Secretary effected this result by excluding the Indian tracts from the communitized unit, purportedly allowing the 1977 leases on those tracts to expire, and then permitting reinclusion of the Indian tracts in the original unit after new leases had been issued to Tomlinson. Appellants point out that Cotton specifically prohibits the Secretary from refusing "to approve an otherwise fair and proper communitization agreement for the sole purpose of causing the underlying lease--which the Secretary had previously approved--to expire," Cotton, 870 F.2d at 1528, and from thereafter including Indian tracts in a unit from which these tracts had originally been excluded, simply for the purpose of receiving revenues from unit wells located on non-Indian tracts.
 
 
 22
 Guidelines for the BIA's authority to approve communitization of Indian oil and gas leases followed our ruling in Kenai, supra. In relevant part, they read:
 
 
 23
 The Secretary has the discretion to approve or disapprove Communitization or Unit Agreements based on a determination of whether approval would be in the best interests of the Indian lessor. Area Directors and Superintendents must prepare such a determination in writing, based on logical engineering and economic facts, whether the agreement is approved or disapproved, and that document should be given to the applicant and the Indian lessor. In determining whether the agreement is or is not in the best interest of the Indian lessor, the following should be considered:
 
 
 24
 (a) The long term economic effects of the agreement must be in the best interest of the Indian lessor and we must be able to document these effects.
 
 
 25
 (b) The Minerals Management Service is required to recommend approval or disapproval based upon the engineering and technical aspects of the agreement to assure protection of the interests of the Indian lessor, and BIA officials should rely on that recommendation.
 
 
 26
 (c) The lessee in question must have complied with the terms of the lease in all respects, including the commencement of drilling operations, or actual drilling, or actual production in paying quantities (depending on the terms of the lease), within the unit area prior to the expiration date of any Indian lease, Cotton, at 1518.
 
 
 27
 Nowhere, however, do these guidelines authorize the Secretary to disregard or sweep aside legitimate existing contractual expectations in a lease merely because an Indian lessor could earn a greater profit from a subsequent would-be lessee.
 
 
 28
 The Secretary's mere perfunctory articulation of the arguments advanced by one of the parties to the proposed communitization agreement, without an analysis and discussion of the issues, does not satisfy the requirement we underscored in Cotton. See Cotton, 870 F.2d at 1525-26 (reciting specific factors enumerated in BIA Guidelines). Apparently basing his disapproval of the communitization agreement on what was perceived to be the short-term financial interest of the Indian lessors, the Secretary appeared not to accord any significant weight to the other factors. Indeed, the approach the Secretary took in the instant case, rather than furthering Indian interests, could in the long run be harmful to the interests of Indian lessors. The District Court below recognized and was obviously troubled by this implication, stating during his oral ruling that
 
 
 29
 "[I]t may be that the lessees in the future will be more wary about a transaction involving Indians and Indian land given what the Secretary did here, and that in the market the overall value of such leases would thus be diminished relative to other opportunities in which lessees could invest. Even if that is a possibility, this is just another factor that Indians will have to take into account when they make their decisions how to react to any communitization proposals and is something that the Secretary may in the future want to include with more prominence and more precise analysis as one aspect of the economic benefit analysis that he does."If such action as the Secretary took here were to be seen as expected behavior, then a drilling company might well be hesitant to enter into a lease with an Indian lessor, having a justifiable concern that after substantial expense its contract would "not be worth the paper it was written on."[3]
 
 
 30
 We note that the leases in Cotton contained the same "express covenants" present here:
 
 
 31
 "[I]f the lessee shall commence to drill a well within the terms of this lease, the lessee shall have the right to drill such well to completion ... and if oil or gas, ... be found in paying quantities, this lease shall continue....
 
 
 32
 * * * * * *
 
 
 33
 The parties hereto agree to subscribe to and abide by any agreement for the cooperative or unit development of the field or area, affecting the leased lands...." Cotton, at 1516.
 
 
 34
 In Cotton, we found it "[s]ignificant to this appeal [that] the Assistant Secretary did not discuss or analyze the various factors required under the guidelines set forth in his memorandum [and in Kenai ] ...," and that he relied simply upon the statement that his action was in the best interest of the Indian appellants. Cotton, at 1525.
 
 
 35
 When an administrative agency deviates from its established procedures, the presumption of administrative regularity does not apply. Wilson v. Hodel, 758 F.2d 1369 (10th Cir.1985). In this case, as in Cotton, "[i]nstead of evaluating the communitization agreement on its merits, the Secretary used its rejection as a triggering event to cause the termination of a separate instrument, the lease." Cotton, at 1528. In Cotton, we vacated the Secretary's decision as an abuse of discretion, finding that to reject a communitization agreement for the purpose of allowing an Indian lease to expire and then to include the same tract in the same unit in order to allow retroactive participation in unit revenue was arbitrary and capricious. Cotton, 870 F.2d at 1527.
 
 
 36
 Cheyenne-Arapaho does not mandate otherwise, for there we affirmed the District Court finding "that the Area Director breached his trust responsibility to the Tribe under the MLA by approving the communitization agreements without studying the economic conditions prevailing at the time," Cheyenne-Arapaho, at 586, and we stated that "after reviewing the record, this Court agrees with the district court that the trust responsibilities to the Tribe were uncontrovertedly breached by failure to examine all relevant factors before approving the agreement," Cheyenne-Arapaho, at 590. As a fiduciary, the Secretary of course must represent the best interests of the Indian lessors. See Cheyenne-Arapaho, 966 F.2d at 588; Cotton Petroleum, 870 F.2d at 1524; Kenai, 671 F.2d at 386. However, in most commercial relationships, a party's self-interest cannot be viewed in a vacuum. If a party, through pretext, can rescind or escape a contract for no reason intrinsic to the contract itself, but merely because the party anticipates additional financial advantage from so doing, then in the long run other parties may refuse to contract with that party. Such an occurrence may therefore ultimately inure to the disadvantage of the Indian lessors.
 
 
 37
 Here, as in Cotton, we again conclude that the Secretary may not allow a lease to expire simply to allow an Indian interest to then include the same tract in the same unit for a new bonus, while simultaneously participating in unit royalties from the old lease. If the only deficiency in the Secretary's actions were an inadequate analysis and discussion of all relevant factors, we might contemplate a remand for further consideration consistent with our opinion. However, here it is obvious that the sole reason behind the Secretary's rejection of the communitization agreement was to provide a pretext for the ulterior motive of enabling the Indian lessors to acquire an additional bonus payment from a new potential contracting party. As we explained in Cotton, to reject a communitization agreement for that purpose, and then to accept essentially an identical communitization agreement, particularly while permitting retroactive benefits to inure to the Indian lessors, constitutes arbitrary and capricious conduct and cannot stand. We therefore conclude that the Secretary's action constituted an abuse of discretion, and accordingly reverse the order and judgment of the District Court affirming the Secretary and remand to the District Court, with instructions to reverse the order of the Secretary, to reinstate the determination of the Anadarko Area Director approving the Communitization Agreement, to declare that the plaintiffs' 1977 leases did not expire, and to declare void the lease granted to Tomlinson by the Indian defendants as well as the Tomlinson Communitization Agreement of September 1, 1982. Further, on remand we direct that there be an accounting of all funds involved, including bonuses, with distribution and/or return to follow as if the Area Director's approval of the plaintiffs' communitization agreement had been timely adopted and affirmed.
 
 
 
 *
 The Honorable Richard Owen, Senior United States District Court Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 Under Oklahoma law, the Commission is authorized to regulate the number of wells that can be drilled into common reservoirs by those who own the right to produce oil and gas. The Commission has the "power to establish well spacing and drilling units of specified and approximately uniform size and shape covering any common source of supply ... of oil or gas within the State of Oklahoma." Okla.Stat. tit. 52, Sec. 87.1(a) (1981)
 
 
 [2]
 The communitization agreement was submitted before the date the leases expired. Assuming later approval, so long as the agreement was submitted prior to the lease expiration it is timely and effective as of the day it was submitted for approval. Cotton Petroleum v. United States Dep't of Interior, 870 F.2d 1515, 1523 (10th Cir.1989)
 
 
 [3]
 The concurring opinion in Kenai, supra, while joining in the Court's conclusion on the facts before it, voiced a similar concern that under other circumstances a Secretary's one-sidedly motivated rejection of a communitization agreement would be "contrary to the public interest." Kenai, at 389. Those circumstances, in our view, are now before us