47 F.3d 1032
 WOODS PETROLEUM CORPORATION; Raytex Resources Incorporated;
Midcon Central Exploration Company; Mustang
Production Company, Plaintiffs-Appellants,
v.
DEPARTMENT OF INTERIOR; Bureau of Indian Affairs; Timothy
Nibs; Wisdom A. Nibs, Jr.; Reginald R. Nibs; Ronald Leroy
Nibs; Elaine Shirley Nibs Mayes; D'Ann Nibs; Lowell Nibs;
Theodore Raymond Nibs; Wisdom Nibs, Sr.; Brenda Tonips
Nibs; Michael Nibs; Leroy Stoneroad; Victor Stoneroad;
Solomon Stoneroad; Eleanor Joy Stoneroad; Joe Hicks; Anna
B. Twins Spottedwolf; Patrick B. Spottedwolf; Lucian M.
Twins; Joyce M. Twins; Minita Twins Runningwater; Wesley
Robert Twins; Lucinda Amelia Sweetwater; Mariam Mann
Twins; McClain H. Twins, Jr.; Marion M. Twins; Michael
Wayne Twins; Tomlinson Properties, Inc., Defendants-Appellees.
 No. 92-6053.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 9, 1995.
 
 Donald L. Kahl of Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK (Orval E. Jones, with him on the brief), for plaintiffs-appellants.
 David C. Shilton, U.S. Dept. of Justice, Washington, DC (Lois J. Schiffer and Roger Clegg, Acting Asst. Attys. Gen., Gerald S. Fish, Dirk Snel and Robert L. Klarquist, U.S. Dept. of Justice, and Timothy D. Leonard, U.S. Atty. and M. Kent Anderson, Asst. U.S. Atty., Oklahoma City, OK, with him on the brief), for defendants-appellees U.S. Dept. of Interior and Bureau of Indian Affairs.
 Steven L. Barghols and Jay C. Jimerson of Mock, Schwabe, Waldo, Elder, Reeves & Bryant, Oklahoma City, OK, on the brief, for defendant-appellee Tomlinson Properties, Inc.
 Amos E. Black, III of Black & Zynda, Anadarko, OK, on the brief, for defendants-appellees Anna Twins Spottedwolf, Eleanor Stoneroad, Victor Stoneroad, and Leroy Stoneroad.
 Before SEYMOUR, Chief Judge, LOGAN, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY, EBEL, KELLY, and HENRY, Circuit Judges.
 ON REHEARING EN BANC
 EBEL, Circuit Judge.
 
 
 1
 We granted the request for rehearing en banc in this case to clarify the Secretary of the Interior's authority under 25 U.S.C. Sec. 396 to disapprove a proposed oil and gas communization agreement that includes Indian-owned mineral interests. Woods Petroleum Corporation and other oil companies ("Woods Petroleum") commenced this action to challenge the Secretary's order rejecting a proposed agreement to communize Indian and non-Indian mineral interests for oil and gas production in the Anadarko region of Oklahoma. The district court upheld the Secretary's order. A panel of this court reversed and remanded with instructions to reverse the Secretary's order and to approve the proposed communization agreement. Woods Petroleum Corp. v. United States Dep't of Interior, 18 F.3d 854 (10th Cir.1994). The United States Department of the Interior, Tomlinson Properties, Inc., and certain of the Indian lessors petitioned for rehearing en banc on the grounds that our panel decision clashed with earlier Tenth Circuit authority.
 
 
 2
 Today, we make explicit that the Secretary acts arbitrarily and abuses his discretion under Sec. 396d when he (1) rejects a proposed communization agreement for the sole purpose of causing the expiration of a valid Indian mineral lease and allowing the Indian lessors to enter into a new, more lucrative, lease, and then (2) approves essentially the identical communization agreement, with the new lessee of the Indian lands simply substituted for the old lessee, and permits the Indian lessors to collect royalties retroactively to the date of first production under the original unit plan. Accordingly, we adhere to our panel decision's reversal of the district court order and we remand with instructions to approve the Woods Petroleum communization agreement.
 
 I. Background
 
 3
 Our panel opinion provides a full recitation of the factual background to this action, Woods Petroleum, 18 F.3d at 855-57, but we review the critical events and rulings to frame our analysis. In February 1977, the Indians named in this action leased their undivided interest in 117.5 net mineral acres in Custer County, Oklahoma to National Cooperative Refinery Association ("National"). The three leases granted National an exclusive right to drill for and extract all oil and gas underlying the land for a primary term of five years and "as much longer thereafter as oil and/or gas is produced in paying quantities."[1] The Concho Agency Superintendent of the Bureau of Indian Affairs ("BIA"), an agency in the United States Department of Interior ("Interior"), approved the leases. Next, the BIA approved National's assignment of its interest in the leases to Woods Petroleum.
 
 
 4
 On May 18, 1979, the Oklahoma Corporation Commission ("Commission") established a 640-acre drilling and spacing unit that included this Indian land.[2] On December 1, 1981, all working interest owners in the unit area executed a communization agreement, naming Woods Petroleum as the unit operator ("Woods Petroleum communization agreement"). Communization permits the development of several contiguous leaseholds as a single unit, so that "operations conducted anywhere within the unit area are deemed to occur on each lease within the communitized area and production anywhere within the unit is deemed to be produced from each tract within the unit." Kenai Oil & Gas, Inc. v. Dep't of the Interior, 671 F.2d 383, 384 (10th Cir.1982).
 
 
 5
 Pursuant to the communization agreement--and six weeks prior to the expiration date of the leases--Woods Petroleum commenced drilling the authorized well on a non-Indian tract within the unit on January 5, 1982. On February 17, 1982, also prior to the expiration of the Indian leases, Woods Petroleum submitted the communization agreement to Interior for its approval. An approved communization agreement, in conjunction with the "commence drilling" clause, would extend Woods Petroleum's leases beyond the primary term for as long as there is production in paying quantities.
 
 
 6
 On April 12, 1982, the Anadarko Area Director of the BIA approved the proposed Woods Petroleum communization agreement over the Indian lessors' objections. The Indian lessors had unsuccessfully argued that communization was not in their economic best interest because the Secretary's disapproval of the agreement would trigger the expiration of the Indians' existing leases and facilitate the execution of more profitable leases.
 
 
 7
 On September 6, 1983, the Indians filed an administrative appeal to the Assistant Secretary of Interior.[3] Notably, the Indians did not object to any particular provision in the communization agreement. Instead, they simply argued that their mineral interests could easily be released "on a competitive bid basis and with a stroke of a pen a Communization Agreement can be signed by the Area Director joining validly leased Indian Allotments to the spacing Unit."To evaluate the Indians' appeal, the Deputy Assistant Secretary requested the BIA Area Director to prepare a "best interest assessment." The BIA's "best interest assessment" advised the Assistant Secretary to affirm the Area Director's approval of the Woods Petroleum communization agreement for many reasons. First, the BIA opined that prevailing market conditions could stifle the separate development of the Indian interests under new leases and that the Oklahoma Corporation Commission may not approve independent production, transportation and sale of product.[4] Second, the BIA noted that the Indians would forfeit nearly $400,000 in unit royalties currently held in escrow under the state-approved spacing unit in which production had already occurred. And finally, the BIA presciently anticipated that rejection of the communization agreement could invite protracted litigation.
 
 
 8
 After receiving the BIA's recommendation, the Assistant Secretary solicited comments from both the Indians and Woods Petroleum. Again, the Indians expressed their desire to be able to release their mineral interests for a bonus exceeding $400,000 and then to "be immediately joined with the 640 acre spacing by a Communization Agreement." Notwithstanding the BIA's recommendation, the Assistant Secretary reversed the BIA Area Director's approval of the Woods Petroleum communization agreement on May 15, 1986. The Assistant Secretary did not challenge the appropriateness of the communization agreement as establishing a proper geological and economic unit. Instead, the Assistant Secretary focused on the underlying Indian leases and concluded that it would be in the Indians' best interest to allow the Woods Petroleum leases to expire so that the Indians could enter into new leases with Defendant-Appellee Tomlinson Properties, Inc. ("Tomlinson"), who was willing to pay the Indians a $400,000 bonus. The Assistant Secretary did not address the BIA's specific rationales in support of communization and thus did not analyze the factors enumerated in the BIA guidelines. Relying exclusively on Tomlinson's bonus offer, the Assistant Secretary disapproved the Woods Petroleum communization agreement and issued an order declaring that the Woods Petroleum leases had expired for failure to drill, produce, or communitize during the primary term.
 
 
 9
 On the heels of the Assistant Secretary's order, the Indians promptly released their interest in the 117.5 net mineral acre estate to Tomlinson for a $400,000 bonus. The BIA Area Director approved the new leases on May 23, 1986. Pursuant to the Area Director's approval, the Indian interests were reinserted in the 640-acre state spacing unit. Tomlinson next drafted a communization agreement that was, in all material respects, identical to the Woods Petroleum communization agreement ("Tomlinson communization agreement"). Not only did the Tomlinson communization agreement apply to the same spacing unit, but it was postdated to take effect as of September 1, 1982--thereby enabling the Indian lessors to obtain unit revenues retroactive to the time of first production four years earlier from the first unit well drilled on the spacing unit covered by the Woods Petroleum communization agreement. On September 22, 1986, the Assistant Secretary approved the new Tomlinson communization agreement.
 
 
 10
 On July 28, 1986, Woods Petroleum commenced this action under the Administrative Procedure Act ("APA"), 5 U.S.C. Sec. 701 et seq., in the United States District Court for the Western District of Oklahoma, against Interior, the BIA, the Indian lessors, and Tomlinson. Woods Petroleum alleged that the Assistant Secretary's rejection of the Woods Petroleum communization agreement was arbitrary and capricious and thus should be vacated. Additionally, Woods Petroleum sought an order declaring its 1977 leases superior to the Tomlinson leases. In the alternative, Woods Petroleum argued that if the court upholds the Tomlinson communization agreement, Woods Petroleum was entitled to a refund of all proceeds of unit production paid to the Indians under the 1977 leases.
 
 
 11
 The district court upheld the Assistant Secretary's order rejecting the Woods' communization agreement as a valid exercise of discretion, and subsequently ruled that the Indian mineral interests would be treated as part of the unit from the date of first production, and thus the Indians were entitled to unit royalties back to 1982.
 
 
 12
 Woods Petroleum timely filed its appeal and we reversed and remanded with instructions to reinstate the BIA's order approving the Woods Petroleum communization agreement and to declare void the Tomlinson lease and the Tomlinson communization agreement. Woods Petroleum, 18 F.3d at 860. The panel concluded that "the sole reason behind the Secretary's rejection of the [Woods Petroleum] communization agreement was to provide a pretext for the ulterior motive of enabling the Indian lessors to acquire an additional bonus payment from a new potential contracting party." Id. at 859. "[T]o reject a communization agreement for that purpose, and then to accept essentially an identical communization agreement, particularly while permitting retroactive benefits to inure to the Indian lessors, constitutes arbitrary and capricious conduct and cannot stand." Id. at 859-60. Our analysis followed quite closely the law previously established in Cotton Petroleum Corp. v. United States Dep't of Interior, 870 F.2d 1515 (10th Cir.1989).
 
 
 13
 On April 21, 1994, the government filed a petition for rehearing with suggestion for en banc consideration, arguing that Woods Petroleum and Cotton Petroleum are inconsistent, at least in philosophy, with Kenai, 671 F.2d at 386-88, and Cheyenne-Arapaho Tribes of Oklahoma v. United States, 966 F.2d 583 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1642, 123 L.Ed.2d 265 (1993), and --- U.S. ----, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993). The government's petition stated that the alleged disparities in these opinions cast a cloud of uncertainty over the factors that Interior may consider in approving or rejecting future communization agreements involving Indian lessors.
 
 
 14
 We granted the petition for en banc consideration to clarify the Secretary's authority to approve and reject communization agreements. In so doing, we adhere to the legal principles articulated in our panel decision, Cotton Petroleum, Kenai, and Cheyenne-Arapaho.
 
 II. Discussion
 
 15
 Under the Administrative Procedure Act, we may set aside an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. Sec. 706(2)(A); Cotton Petroleum, 870 F.2d at 1525. An agency decision may be arbitrary and capricious if it fails to consider important relevant factors. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 42-43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983); Cotton Petroleum, 870 F.2d at 1525-26. Alternatively, the decision is arbitrary and capricious if there is no "rational connection between the facts found and the choice made." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).
 
 
 16
 Congress has empowered the Secretary of the Interior with an important supervisory role over oil and gas communization agreements involving Indian mineral interests. See Indian Mineral Leasing Act of 1938, 25 U.S.C. Sec. 396a et seq. Pursuant to 25 U.S.C. Sec. 396d, the Secretary has the discretion to approve or prescribe a "reasonable cooperative unit."
 
 
 17
 All operations under any oil, gas, or other mineral lease issued pursuant to the terms of sections 396a to 396g of this title or any other Act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior. In the discretion of said Secretary, any lease for oil or gas issued under the provisions of sections 396a to 396g of this title shall be made subject to the terms of any reasonable cooperative unit or other plan approved or prescribed by said Secretary prior or subsequent to the issuance of any such lease which involves the development of oil or gas from land covered by such lease.
 
 
 18
 Id.; see also 25 C.F.R. Secs. 211.21(b) (governing tribal lands) & 212.24(c) (governing allotted lands).[5] Thus, inclusion of Indian mineral interests in a cooperative plan, including a state-ordered spacing unit, requires the Secretary's approval.
 
 
 19
 To guide the Secretary's evaluation of a proposed communization agreement involving Indian mineral interests, the BIA promulgated guidelines in 1982 that identify three critical factors: (1) whether the long term economic effects of the proposed agreement are in the Indian lessor's best interest; (2) whether the engineering and technical aspects of the agreement adequately protect the Indian lessors; and (3) whether the lessee has complied with the terms of the lease in all respects prior to its expiration date. Cotton Petroleum, 870 F.2d at 1518 (quoting the BIA Guidelines). The first two of these factors require the Secretary to focus on the communization agreement, and the third factor simply asks if the lessee is in default under the existing lease.
 
 
 20
 In evaluating the Secretary's actions, we must keep in mind that the Secretary and his delegates act as the Indians' fiduciary and thus must represent the Indians' best interests. Cheyenne-Arapaho, 966 F.2d at 588-89; Cotton Petroleum, 870 F.2d at 1524; Kenai, 671 F.2d at 386. The power to manage and regulate Indian mineral interests carries with it the duty to act as a trustee for the benefit of the Indian landowners. Jicarilla Apache Tribe v. Supron Energy Corp., 728 F.2d 1555, 1563-65 (10th Cir.1984) (Seymour, J., concurring in part and dissenting in part), reh'g en banc, 782 F.2d 855 (10th Cir.) (adopting dissenting opinion), modified, 793 F.2d 1171, 479 U.S. 970, 107 S.Ct. 471, 93 L.Ed.2d 416 (1986). Yet, as with any trustee-beneficiary relationship, the Secretary's fiduciary duty to the Indians under Sec. 396d is not boundless and cannot be exercised in a manner that exceeds or flouts the authorizing statute and regulations. When the Secretary deviates from firmly established procedures, or exceeds the limits of his fiduciary duty, we have found an abuse of discretion and have reversed the Secretary.
 
 
 21
 For example, we have consistently admonished the Secretary to analyze all relevant factors and have reversed rulings that either disregarded certain factors or treated one factor as determinative. In Kenai, the lessee alleged that the Secretary's rejection of a communization agreement constituted an abuse of discretion because the Secretary refused to confine his analysis to production and conservation matters. Kenai, 671 F.2d at 387. We eschewed the lessee's restrictive approach and upheld the Secretary's ruling because he properly considered "all relevant factors," including the Indian lessors' economic best interests. Id. at 386-87. Likewise, in Cotton Petroleum, we reversed the Secretary's rejection of a communization agreement, in part, because "the Secretary failed to discuss or analyze all of the relevant factors required in reaching his decision, mandated under his guidelines." Cotton Petroleum, 870 F.2d at 1525-26. And more recently in Cheyenne-Arapaho, we held that the Secretary abused his discretion by approving a communization agreement without first considering relevant economic factors. Cheyenne-Arapaho, 966 F.2d at 589-91.[6]
 
 
 22
 As the Secretary's clearly articulated factors in the BIA guidelines make clear, the issue before the Secretary is whether the communization agreement should be approved, and it is not whether the underlying leases, which previously had been approved by the Secretary, were a good deal or bad deal with the benefit of hindsight. When the Secretary first disapproved the communization agreement for the sole purpose of causing the underlying leases to terminate, and then immediately thereafter approved an identical communization agreement for the new leases, it is obvious that the Secretary was not really evaluating the communization agreement at all. Rather, he was using his power in an arbitrary way to disapprove the communization agreement as a mere vehicle to cause the underlying leases to terminate.
 
 
 23
 In Cotton Petroleum, the record demonstrated that the Secretary did not reject the proposed communitization agreement because the proposed unitization agreement was detrimental to the Indian lessors. Rather, the sole reason behind the Secretary's disapproval was to facilitate the expiration of the original lease and thus to permit the Indian lessors to acquire a new bonus payment from a new lessee, who eagerly offered an additional premium because drilling had already commenced in the spacing unit. Cotton Petroleum, 870 F.2d at 1527. With the Indians' more lucrative lease in hand, the Secretary turned around and approved the identical communitization agreement, ordered inclusion of the Indian tract in the same spacing unit, and awarded retroactive benefits under the original agreement. Id. We reversed because "[i]nstead of evaluating the communitization agreement on its merits, the Secretary used its rejection as a triggering event to cause the termination of a separate instrument, the lease." Id. at 1528.[7]
 
 
 24
 We found no such duplicitous evaluation of a communization plan in Kenai. In Kenai, the Secretary simply concluded that communization was economically unsatisfactory for the Indians given the likelihood of increased revenues under a new lease. There, productive wells had been drilled directly on the Indian land and there was no suggestion that the new lease would be pooled with neighboring tracts. Kenai, 671 F.2d at 387. In contrast to the actions of the Secretary in the instant case and in Cotton Petroleum, the Secretary in Kenai did not take inconsistent and arbitrary positions with regard to communization.[8]
 
 
 25
 Similarly, there is nothing in our opinion in Cheyenne-Arapaho suggesting that the Secretary could take inconsistent positions on a communization agreement merely to allow Indians the opportunity to release their land on more attractive terms. To the contrary, we simply held there that the Secretary breached his fiduciary duty to the Indians by approving communization without considering the economic impact to Indian mineral interest owners if their tracts were de-spaced. Cheyenne-Arapaho, 966 F.2d at 590-91. Communization in Cheyenne-Arapaho involved only Indian land, and wells had already been drilled on several of the Indian leases. The issue was only whether the Secretary should have considered the economic consequences of new leases as contrasted to the communitized development of the Indian land, and we held that the Secretary should have considered all factors.
 
 
 26
 Thus, Kenai, Cotton Petroleum, and Cheyenne-Arapaho define certain boundaries for the Secretary's supervisory authority under 25 U.S.C. Sec. 396d and his fiduciary duty to Indian mineral interests. As a threshold matter, we have consistently adhered to the principle that the Secretary must analyze all relevant factors articulated in the 1982 BIA guidelines in judging the propriety of a proposed communization agreement. Further, the Secretary's task under Sec. 396d is to provide a bona fide evaluation of the communization plan, not to use that evaluation as a mere vehicle to achieve an ulterior objective otherwise unattainable. Cf. United Nuclear Corp. v. United States, 912 F.2d 1432, 1438 (Fed.Cir.1990) (holding that the Secretary's refusal to approve a mining plan submitted by a mining company that had been awarded leases on Indian reservation constituted a taking under the Fifth Amendment, rather than a proper exercise of fiduciary duty, because, in part, the Secretary's action was "an attempt to enable the Tribe to exact additional money from a company with whom it had a valid contract"). This is not to say that the Secretary may not reject a communization agreement either because an analysis of all relevant factors fairly leads to the conclusion that the particular agreement is not advantageous to the Indians, or because the Secretary determines that it is in the Indian lessor's best interests to forego communization altogether. However, it is to say that the process of evaluating a communization agreement is not a sham process but rather must be exercised in good faith, and the Secretary may not act arbitrarily and inconsistently in exercising his approval powers.
 
 
 27
 The Secretary acknowledges that the sole purpose behind his disapproval of the Woods Petroleum communization agreement was to enable the Indian lessors to enter into more profitable leases with Tomlinson. Sweeping aside the BIA guideline factors, which his delegate had concluded pointed strongly in favor of approving the Woods Petroleum agreement, the Secretary mimicked the wrongful actions in Cotton Petroleum by: (1) rejecting one communization agreement for the sole purpose of allowing a valid lease to expire and to be replaced by a more lucrative lease; and then (2) including the Indian mineral interests in the same state-ordered spacing unit under an identical communization agreement, and awarding retroactive royalties generated by the unit. The Secretary found no factor intrinsic to the Woods Petroleum communization agreement that merited disapproval. Indeed, the Secretary ignored the relevant communization factors spelled out in the 1982 BIA guidelines, namely the long-term economic effects of the communization agreement, the conservation and technical aspects of the agreement, and whether the lessee complied with the lease terms. Cotton Petroleum, 870 F.2d at 1518.
 
 
 28
 An additional factor that separates Cheyenne-Arapaho and Kenai from the instant case and Cotton Petroleum is that the Indian mineral interests in Cheyenne-Arapaho and Kenai had not been placed in a state-ordered spacing unit at the time the lessees presented the proposed communization agreement to the Secretary for his approval. Here, as in Cotton Petroleum, the Oklahoma Corporation Commission had already approved a 640-acre drilling and spacing unit, signifying that the Indian mineral interests were situated within a common source of supply.
 
 
 29
 Because the Secretary must approve any state-ordered spacing unit that includes Indian mineral interests, 25 C.F.R. Sec. 212.24(c), the Oklahoma Corporation Commission's spacing order does not protect the Indian mineral owners until the Secretary approves the plan. Absent a communization agreement, Indian owners of tracts adjacent to a producing well may have no right to share in the revenues generated by that well, even if oil and gas has been drained from their property. Thus, both here and in Cotton Petroleum--where the only producing wells were off Indian land--the Secretary's rejection of the communization agreement risked forfeiture of the Indian mineral owners' right to share unit revenues generated from the producing wells on non-Indian tracts within the unit and jeopardized the independent development of the Indian tracts. The Secretary sought to avert these adverse ramifications in the instant case and in Cotton Petroleum by promptly approving new communization agreements and awarding the Indian mineral owners royalties retroactive to the date of first production in the unit. In so doing, however, the Secretary merely demonstrated the arbitrariness of his action in disapproving the communization agreement.[9]
 
 
 30
 Having concluded that the Secretary acted arbitrarily and abused his discretion, we next consider the appropriate remedy. Under the APA, a reviewing court must rely on the administrative record to assess the validity of the agency action. Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam). When the agency has failed to explain adequately the rationale underlying its action, and "further explanation is necessary to a proper assessment of the agency's decision," the court should ordinarily remand for further proceedings. Id. at 143, 93 S.Ct. at 1244. As we explained in our panel opinion, "[i]f the only deficiency in the Secretary's actions were an inadequate analysis and discussion of all relevant factors [in the BIA guidelines]," remand would be appropriate in light of Camp. Woods Petroleum, 18 F.3d at 859.
 
 
 31
 However, remand for further explanation would be fruitless in this case because the Secretary has unequivocally explained his action as intended to facilitate the expiration of the Woods Petroleum lease and the Indians' receipt of a bonus payment from Tomlinson. With respect to the propriety of the Woods Petroleum communization agreement, neither the Secretary nor the Indian lessors has ever identified any deficiencies, and the Secretary's approval of the identical Tomlinson communization agreement is tantamount to an approval of the reasonableness of the Woods Petroleum communization agreement. In fact, the BIA Area Director's "best interest assessment," properly analyzed through the lens of the 1982 BIA guidelines, recommended approval of the Woods Petroleum communization agreement. Because this recommendation provides a full recitation of the relevant factors, and no parties object to the substance of the BIA's evaluation of the communization agreement, we conclude that the BIA Area Director's approval of the Woods Petroleum communization agreement should be upheld.
 
 III. Conclusion
 
 32
 For the foregoing reasons, we REVERSE the district court's order and REMAND with instructions to reverse the Secretary's order, to reinstate the BIA Area Director's approval of the Woods Petroleum communization agreement, to declare that the Woods Petroleum leases have not expired, and to declare void both the Tomlinson communization agreement and the Tomlinson leases. Finally, we direct the court to conduct an accounting of all funds involved, including bonuses, with distribution and/or return to follow as if the Area Director's approval of the Woods Petroleum communization agreement had been timely adopted and AFFIRMED.
 
 
 33
 HENRY, Circuit Judge, dissenting, with whom SEYMOUR, Chief Circuit Judge, joins:
 
 
 34
 Acknowledging the Secretary of the Interior's fiduciary obligations, the majority overturns a decision that resulted in the negotiation of more lucrative leases on behalf of Indian mineral owners. I find the majority's reasoning inconsistent with both the paramount obligation of trust that our government owes to its indigenous peoples and with the great deference that we generally afford to agency decisions. By imposing requirements on the Secretary that we have not required of other agencies, the majority undermines the generally established standard of review for administrative decisions. The majority opinion also does not resolve the conflict in our prior cases regarding the Secretary's evaluation of communization agreements. Therefore, I must respectfully dissent.
 
 
 35
 As the majority notes, we may overturn an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A). The Supreme Court has explained this narrow standard of review as follows:
 
 
 36
 Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.
 
 
 37
 Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).
 
 
 38
 In my judgment, in disapproving the Woods communization agreement, the Assistant Secretary made a reasoned decision to which we should defer. I base this conclusion on an examination of the Secretary's fiduciary obligations to Indian mineral owners, our prior decisions regarding the evaluation of communization agreements governing tribal and allotted lands, and the record of the Interior Department proceedings, which reflects extensive efforts by the Assistant Secretary to obtain and review relevant facts and law.
 
 A. The Secretary's Fiduciary Obligations
 
 39
 In its dealings with Indian peoples, the federal government "has charged itself with moral obligations of the highest responsibility and trust." Seminole Nation v. United States, 316 U.S. 286, 297, 62 S.Ct. 1049, 1055, 86 L.Ed. 1480 (1942). As a result, the relationship between the Indians and the federal government "is marked by peculiar and cardinal distinctions which exist nowhere else" and "resembles that of a ward to his guardian." Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 16-17, 8 L.Ed. 25 (1831). See generally Jicarilla Apache Tribe v. Supron Energy Corp., 728 F.2d 1555, 1563 (10th Cir.1984) (Seymour, J., dissenting) (discussing Secretary of the Interior's fiduciary obligations to Indian mineral owners), dissenting opinion adopted as majority opinion as modified, 782 F.2d 855 (10th Cir.) (en banc), cert. denied, 479 U.S. 970, 107 S.Ct. 471, 93 L.Ed.2d 416 (1986); Stephen L. Pevar, The Rights of Indians and Tribes 26-36 (2d ed. 1992).
 
 
 40
 In addition to this general trust relationship, there are "other, context-specific trust relationships of varying depth and responsibility" that arise in particular areas of federal government regulation involving Indian people. Jicarilla, 728 F.2d at 1563. One scholar has observed that "the more specific the obligation, the higher the duty of care." Pevar, supra, at 28.
 
 
 41
 In Jicarilla, we examined the federal government's role in the leasing of minerals located on land owned by an Indian tribe. After considering the provisions of the Indian Mineral Leasing Act, 25 U.S.C. Secs. 396a-396g, accompanying regulations, and the Act's legislative history, we concluded that Congress intended for the Secretary of the Interior to act as a fiduciary for Indian mineral owners. We found that "[t]he evident purpose of the statute is to ensure that Indian tribes receive the maximum benefit from mineral deposits on their lands through leasing." Jicarilla, 728 F.2d at 1565. We further noted that the regulations enacted pursuant to the Indian Mineral Leasing Act repeatedly stress that the Secretary "must act in the best interests of the tribes." Id. We deemed it significant that the Act was passed because, " 'it [was] not believed that the present law [was] adequate to give the Indians the greatest return from their property.' " Id. (quoting Senate Report No. 985, at 2 (1937); House Report No. 1872, at 2 (1938)).
 
 
 42
 The fiduciary obligation we outlined in Jicarilla informs courts' assessments of particular statutes and regulations. As a result, whenever doubt or ambiguity exists in the applicable statutory and regulatory provisions, "such doubt is resolved in favor of the tribes." Jicarilla, 728 F.2d at 1563 (citing Bryan v. Itasca County, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976)). The Secretary's fiduciary responsibilities also limit the range of regulatory decisions that he or she may make:
 
 
 43
 When the Secretary is acting in his fiduciary role rather than solely as a regulator and is faced with a decision for which there is more than one "reasonable" choice as that term is used in administrative law, he must choose the alternative that is in the best interests of the Indian tribe. In short, he cannot escape his role as trustee by donning the mantle of administrator....
 
 
 44
 Id., at 1567 (emphasis added).
 
 
 45
 These principles of fiduciary responsibility apply to the instant case. Like the statutes and regulations that we analyzed in Jicarilla, the statute that quite specifically governs the leasing of allotted Indian lands, 25 U.S.C. Sec. 396, vests broad discretion in the Secretary of the Interior. Enacted in 1909, the statute authorizes the Secretary to execute mining leases for any term of years that he deems advisable. It states that the Secretary may "perform any and all acts and make such rules and regulations as may be necessary for the purpose of carrying the provisions of this section into full force and effect." 25 U.S.C. Sec. 396. In addition, the statute expressly grants the Secretary the right to "reject all bids whenever in his judgment the interests of the Indians will be served by so doing, and to readvertise such lease for sale." Id.
 
 
 46
 The legislative history of 25 U.S.C. Sec. 396 is instructive. As originally drafted, the statute authorized the leasing of allotted lands without restrictions. However, the Secretary of the Interior objected to the absence of restrictions, observing that "[e]xperience has shown that this is unjust to the Indians, as the inrush of prospective miners is always prejudicial to the Indians' interests, and, in justice to them, the Department should not recommend favorable action on any bill that would render them insecure in their homes." H.R.Rep. No. 1225, 60th Cong., 1st Sess. 2 (1908). The bill was then amended to address the Secretary's concerns. Id. The Federal Circuit has concluded that, in enacting 25 U.S.C. Sec. 396, "Congress was much interested in having [the] Interior [Department] oversee the leasing of the Indian lands so as to prevent exploitation of and prejudice to the Indians' interest, or injustice to them." Pawnee v. United States, 830 F.2d 187, 189 n. 2 (Fed.Cir.1987), cert. denied, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988) (citing H.R.Rep. No. 1225, 60th Cong., 1st Sess. 1-2 (1908)).
 
 
 47
 The statute authorizing the Secretary to approve communization agreements on allotted and tribal lands, 25 U.S.C. Sec. 396d, was enacted with a similar purpose. Section 396d is part of the Indian Mineral Leasing Act, which we examined in Jicarilla and which Congress passed in order "to achieve uniformity in tribal leasing matters; to increase Indian authority in granting leases; and to protect the Indians' economic return on their property." Assiniboine & Sioux Tribes v. Board of Oil & Gas Conservation, 792 F.2d 782, 796 (9th Cir.1986). Section 396d gives the Secretary and his or her delegates broad discretion to approve or disapprove communization agreements governing leases of Indian land. Kenai Oil & Gas, Inc. v. Department of the Interior, 671 F.2d 383, 386 (10th Cir.1982). An accompanying regulation, 25 C.F.R. Sec. 212.24(c), provides that leases of allotted lands "shall be subject to a cooperative unit or development plan affecting the leased lands if and when required by the Secretary of the Interior." Like 25 U.S.C. Sec. 396d, Section 212.24(c) places no limits on the Secretary's discretion in assessing communization agreements. However, it is part of the general regulatory framework governing the leasing of Indian lands that requires the Secretary and his or her delegates to act in the best interests of Indian mineral owners. See Jicarilla, 728 F.2d at 1565.
 
 
 48
 Accordingly, in deciding whether to approve or disapprove communization agreements governing allotted lands such as those at issue here, the Secretary must act as a fiduciary for Indian mineral owners, guided by the same exacting standards that we outlined in Jicarilla. See Pawnee, 830 F.2d at 190. In exercising this duty to the Indian owners, "[n]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Seminole Nation, 316 U.S. at 297 n. 12, 62 S.Ct. at 1055 n. 12 (quoting Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928) (Cardozo, J.)). That fiduciary duty of utter loyalty, combined with our narrow standard of review, should guide our analysis of the Assistant Secretary's decision to disapprove the Woods communization agreement.
 
 
 49
 B. Kenai, Cheyenne-Arapaho, and Cotton Petroleum
 
 
 50
 We have discussed the Secretary's obligation in evaluating communization agreements affecting leases of tribal and allotted lands in several prior cases: Cheyenne-Arapaho Tribes v. United States, 966 F.2d 583 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1642, 123 L.Ed.2d 265 and --- U.S. ----, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993); Cotton Petroleum Corp. v. Department of the Interior, 870 F.2d 1515 (10th Cir.1989); and Kenai, supra, 671 F.2d 383. The majority reads those decisions as establishing a uniform body of law that provides that, in assessing a communization agreement, the Secretary must consider all the relevant factors and may not treat one factor as determinative. I agree that we have consistently directed the Secretary to consider all the relevant factors. However, I believe that our cases are in conflict as to whether particular factors may be determinative. An examination of our prior decisions illustrates this conflict.
 
 
 51
 In Kenai, we held that the Secretary's designate, the Superintendent of the Bureau of Indian Affairs (BIA), did not abuse his discretion when he refused to approve a communization agreement that, if approved, would have extended the terms of several mineral leases of restricted Indian land. We reviewed testimony from the Superintendent, who had stated that he reached his decision because he had determined that the subject tracts could be re-leased for higher royalty payments and bonuses if the original leases were not extended by the proposed communization agreement. Noting that the Secretary and his delegates had a duty to maximize lease revenues for the Indian mineral owners, we found that Interior Department officials had no obligation to approve a plan that did not serve the best interests of the Indian owners and that they acted within their discretion "in refusing to approve an economically unsatisfactory plan." Kenai, 671 F.2d at 387.
 
 
 52
 In Cheyenne-Arapaho, we applied Kenai and found that the Secretary and his delegates breached their fiduciary obligation by approving a communization agreement governing mineral leases in Custer County, Oklahoma. In arguing that the Interior Department had satisfied its obligations to the Cheyenne-Arapaho Tribe by approving the subject agreement, the Secretary maintained that disapproval would create a risk that new leases could not be negotiated and that retaliatory litigation might be brought by lessees whose interests were terminated by disapproval of the agreement. We rejected that explanation, characterizing it as an argument for "across-the-board" approval of communization agreements that was inconsistent with the required policy of maximizing tribal revenues. Cheyenne-Arapaho, 966 F.2d at 590-91. Because the market for oil and gas leases in Custer County, Oklahoma in the early 1980s was extremely favorable for mineral owners, we held that the Secretary and his delegates abused their discretion by declining to consider the market value and marketability of leases that could have been negotiated for the tribe if the subject communization agreement had been disapproved so that more profitable leases could have been negotiated.
 
 
 53
 In Cotton Petroleum, decided after Kenai but before Cheyenne-Arapaho, we described the Secretary's obligations in evaluating communization agreements somewhat differently. We reversed an Interior Department decision regarding a proposed communization agreement finding that, "[o]n the totality of the record before us," the decision constituted an abuse of discretion. Cotton Petroleum, 870 F.2d at 1529. The decision in Cotton Petroleum concerned a proposed communization agreement that was submitted shortly before a mineral lease of a restricted Indian allotment was scheduled to expire. Just as in Kenai and Cheyenne-Arapaho, one effect of the proposed agreement was to extend the terms of underlying leases. An Area Director of the BIA approved the agreement, but an Assistant Secretary (rendering a final decision for the Interior Department) reversed the Area Director's decision and disapproved the agreement.
 
 
 54
 In particular, the Assistant Secretary found that approval of the agreement was not in the best interests of an Indian mineral owner. However, after disapproving the subject agreement, the Assistant Secretary proceeded to include the subject tract within the unit established by the communization agreement and to rule that the Indian mineral owner was entitled to royalties under the terms of the very communization agreement that he had disapproved. Id. at 1520-21, 1527.
 
 
 55
 In reversing the Assistant Secretary's decision, we noted the inconsistency of disapproving the communization agreement for purposes of allowing the subject lease to terminate so that a new, more lucrative lease could be negotiated, and then including the subject tract in a unit and awarding royalties under the same partially rejected agreement. See id. at 1527 ("To reject the communization agreement and then immediately to affirm it and to award the ... appellees retroactive benefits under it exposes the arbitrary and capricious nature of the Secretary's action."). We also observed that the Assistant Secretary's decision was inconsistent with the Department's treatment of other Indian lessors in the same unit area. Specifically, the Area Director of the BIA had unequivocally approved the same communization agreement as to other Indian leases within the same proposed unit. We found no adequate and reasoned explanation in the record of the differing treatment afforded similarly situated Indian lessors. Id.
 
 
 56
 However, in addition to these factors, we based our reversal of the Assistant Secretary's decision in Cotton Petroleum on reasoning that I find inconsistent with Kenai and Cheyenne-Arapaho. In particular, we criticized the Assistant Secretary for failing to evaluate the communization agreement "on its merits" and for using his decision partially disapproving the proposed agreement as "a triggering event to cause the termination of a separate instrument, the lease." Id. at 1528. Compare Kenai, 671 F.2d at 386 (affirming disapproval of communization agreement on the basis of its effect on the underlying leases).
 
 
 57
 Finally, in Cotton Petroleum, as the majority notes, we found that the Assistant Secretary had failed to consider the following relevant factors in reaching his decision: (1) whether the long-term economic effects of the proposed communization agreement served the best interests of the Indian lessors; (2) whether the geological and engineering aspects of the agreement furthered those interests; and (3) whether the lessee had complied with the terms of the lease, including commencing drilling operations within the proposed unit prior to the expiration of the Indian leases. Cotton Petroleum, 870 F.2d at 1518, 1525. These factors, we explained, were set forth in the BIA guidelines (promulgated in response to our Kenai decision) regarding the evaluation of communization agreements. We focused on the Assistant Secretary's final written decision, observing that he did not discuss the guideline factors and made no effort to explain his failure to do so. Id. at 1526.
 
 
 58
 C. Communization Agreements and Underlying Leases
 
 
 59
 In light of these prior decisions, we are presented with contrasting principles to apply. Kenai holds that the Secretary may disapprove a particular communization agreement in order to allow underlying leases to expire and new, more profitable leases to be negotiated. Cheyenne-Arapaho finds that the Secretary breached his fiduciary obligation to Indian mineral interest owners by failing to consider the economic benefit that they would obtain through the disapproval of a particular communization agreement. Our conclusion in Cheyenne-Arapaho that the Secretary breached his fiduciary duty is based on the principle that the Secretary could have properly decided to disapprove the communization agreement for the specific purpose of allowing new, more profitable leases to be negotiated. In contrast, Cotton Petroleum declares that it is improper for the Secretary to base a decision regarding a communization agreement on its effect on an underlying lease.
 
 
 60
 Finding this case analogous to Cotton Petroleum, the majority concludes that, in a particular circumstance, it is improper for the Secretary to disapprove a communization agreement on the basis of the agreement's effect on underlying leases. According to the majority, the Secretary acts arbitrarily and capriciously and abuses his or her discretion when he or she disapproves a specific agreement in order to allow Indian mineral owners to negotiate more profitable leases and then subsequently approves a second communization agreement that establishes the same unit area as the agreement that he has previously rejected. In so holding, I believe that the majority reads Cotton Petroleum too expansively and implicitly rejects important principles set forth in Kenai and Cheyenne-Arapaho, thereby transforming the Secretary into something less than a fiduciary for the Indian mineral owners and our review of Interior Department decisions into something more than a search for arbitrary and capricious action. For several reasons, I find the reasoning of Kenai and Cheyenne-Arapaho more convincing on this issue, and I think it should apply.
 
 
 61
 First, nothing in the applicable statutes and regulations prevents the Secretary from considering the manner in which a proposed communization agreement impacts upon underlying leases. A plain reading of 25 U.S.C Sec. 396 gives the Secretary broad discretion to perform "any and all acts" and to make all such rules and regulations that are necessary to carrying out its provisions. Similarly, the terms of 25 U.S.C. Sec. 396d and 25 C.F.R. Sec. 212.24(c) place no constraints on the Secretary's discretion.
 
 
 62
 In the absence of specific statutory or regulatory limitations, the Secretary's discretion is controlled by the fiduciary obligation that governs the leasing of Indian mineral interests. It cannot be disputed that this fiduciary obligation has an economic component. See Jicarilla, 728 F.2d at 1568 ("[T]he purpose of the Indian Mineral Leasing Act is to ensure that Indian tribes receive the maximum benefit from mineral deposits on their lands, ... and we should construe regulations enacted under this Act in light of this purpose.") (emphasis added); Kenai, 671 F.2d at 386 ("As a fiduciary for the Indians, the Secretary is responsible for overseeing the economic interests of Indian lessors, and has a duty to maximize lease revenues.") (emphasis added) (citation omitted). Indeed, a damages remedy is available to Indian owners when the federal government breaches its fiduciary obligations. See United States v. Mitchell, 463 U.S. 206, 228, 103 S.Ct. 2961, 2973-74, 77 L.Ed.2d 580 (1983). The Supreme Court has stated that "[i]t would be anomalous to conclude that these enactments [establishing a fiduciary relationship] create a right to the value of certain resources when the Secretary lives up to his duties, but no right to the value of the resources if the Secretary's duties are not performed." Id. at 227, 103 S.Ct. at 2973. Of course, the economic exploitation of the land and resources of Indian peoples has permeated our history, making the need for exacting fiduciary standards all the more urgent. See generally United States v. Michigan, 471 F.Supp. 192 (W.D.Mich.1979) (discussing Indian removal policy), remanded on other grounds, 623 F.2d 448 (6th Cir.1980). Chronicling the history of Indians in Oklahoma, Dr. Angie Debo has described an "orgy of exploitation" that is "almost beyond belief." Angie Debo, And Still the Waters Run vii (1st ed. 1940). Dr. Debo notes, "Within a generation, these Indians, who had owned and governed a region greater in area and potential wealth than many an American state, were almost stripped of their holdings and were rescued from starvation only through public charity." Id. Over the last twenty-five years, partly in response to the work of Dr. Debo and other scholars, the President and Congress have repeatedly recognized this exploitation and have taken laudable steps to prevent it. See Pevar, supra, at 8-11.
 
 
 63
 In light of the broad authority granted by 25 U.S.C. Sec. 396, 25 U.S.C. Sec. 396d, and 25 C.F.R. Sec. 212.24(c), and in light of the Secretary's overriding fiduciary obligation, I see no reason why the Secretary should be prevented from considering the effect of a communization agreement on underlying leases. As this case illustrates, the economic effect of the continuation or expiration of a lease is often substantial. Lessees such as Woods and Tomlinson no doubt seek communization in part because of the effect that it will have on underlying leases. To bar the Secretary from considering this effect on behalf of the Indian lessors prevents him from assessing an important factor that directly impacts on the economic welfare of those whom he has the highest duty to protect.
 
 
 64
 Contrary to the majority's suggestion that it is "duplicitous" for the Secretary to base a decision regarding a particular agreement on the manner in which it affects an underlying lease, maj. op. at 1039, I view that effect as one of several consequences of this kind of agreement that the Secretary ought to consider. Agreements such as the ones proposed by Woods and Tomlinson extend the terms of leases that contain "commence drilling" clauses by stipulating that:
 
 
 65
 the actual drilling, completion, continued operation or production of a well or wells for communitized substances on the communitized area shall be construed and considered as the actual drilling, completing, continued operation or production from each and all of the lands within and comprising said communitized area.
 
 
 66
 Applts.App. at 3-4. I do not understand why this kind of clause (which often has tremendous economic consequences for all the parties) should be insulated from the Secretary's fiduciary scrutiny when he reviews an agreement.
 
 
 67
 Nor do I see any contractual impediments to the Secretary's consideration of how a communization agreement affects an underlying lease. The leases at issue contain a clause that states that the parties "agree to subscribe to and abide by any agreement for the cooperative or unit development of the field or area, affecting the leased lands, or any pool thereof, if and when collectively adopted by a majority operating interest therein and approved by the Secretary of the Interior." Applts.App. at 79, 83. (emphasis added). Thus, the leases in no way establish a right to communization or to the continuation of their primary terms through the approval of a communization agreement. They expressly commit the decision regarding approval of a particular agreement to the discretion of the Secretary, and they do not purport to limit his exercise of discretion.
 
 
 68
 Moreover, in this case, contrary to the panel opinion's suggestion, neither the Assistant Secretary nor the Indian mineral owners sought to "rescind or escape a contract." Woods Petroleum Corp. v. Department of the Interior, 18 F.3d 854, 859 (10th Cir.1994). The leases here at issue had primary terms of five years. During that time, Woods and the other lessees had the right to drill on the subject allotted tracts or submit a communization agreement to the Secretary. Nothing in the record indicates the Secretary or the Indian mineral owners sought to prevent the lessees from exercising their contractual right to drill for minerals. The fact that Woods never drilled a well on the subject tracts, only began to drill a well on an adjacent tract some six weeks prior to the end of the primary terms of the leases, and did not tender a completely executed communization agreement to the BIA until eight days before the end of those primary terms cannot be attributed to any contractual breach by Interior Department officials or the Indian mineral owners. See maj. op. at 1035; Applts.App. at 77, 80-81, 84 (primary terms expired on February 25, 1982). In such a situation, disapproval of the Woods agreement on the basis of its effect on the underlying leases was a decision that the leases permitted; there was no escape or rescission of a contractual obligation by either the Assistant Secretary or the Indian mineral owners.
 
 
 69
 In addition, in my opinion, the requirement that the Secretary consider all the relevant factors in assessing communization agreements does not prevent her or him from basing a decision on the effect that a particular agreement has on underlying leases. To be sure, in reversing the Secretary's decisions, both Cotton Petroleum and the majority rely on the BIA's post-Kenai guidelines concerning the evaluation of communization agreements. However, although those guidelines direct BIA directors and superintendents to consider certain factors and to issue written explanations of their conclusions, they do not purport to suggest what weight must given to each factor. Thus, if a particular agreement is determined to be geologically and technically warranted but not in the best economic interests of the Indian lessors, the guidelines are silent as to whether the Secretary and his or her delegates should rely on the factors that support approval of the agreement or the factors that suggest that it should be disapproved. The weighing of the factors is a matter that the guidelines leave to the discretion of Interior Department officials, who must act in accordance with their fiduciary obligation to Indian mineral owners. In my judgment, as long as the record of Interior Department proceedings indicates that the Secretary and his or her delegates considered the guideline factors, they may certainly determine that one of those factors (such as the economic benefits that the Indian owners would obtain from the negotiation of new leases) outweighs the others and should be dispositive as to whether a particular agreement is approved or disapproved.
 
 
 70
 Finally, I am unconvinced by the majority's conclusion that the Secretary's approval of a second communization agreement establishing the same unit area as a previously rejected agreement signifies that it was improper for the Secretary to have based the disapproval of the first agreement on its effect on underlying leases. In so holding, the majority essentially concludes that although the Secretary should consider the economic effects of communization generally, see maj. op. at 1039, he or she is barred from considering the substantial economic effect of a decision to approve or disapprove a specific agreement at a particular time I discern nothing in the Indian Mineral Leasing Act, accompanying regulations, or federal law concerning the Secretary's fiduciary duties that so limits his or her discretion.
 
 
 71
 D. The Assistant Secretary's Consideration of the Relevant
 
 Factors in this Case
 
 72
 In addition to concluding that it was improper for the Assistant Secretary to base his decision regarding the approval or disapproval of the subject communization agreement on the effect of that agreement on underlying leases, the majority finds that the Assistant Secretary did not consider the relevant factors. I disagree with that conclusion as well.
 
 
 73
 As the majority notes, after the Indian lessors appealed the BIA Area Director's initial approval of the Woods communization agreement to the Office of the Secretary, the Deputy Assistant Secretary requested a "best-interest assessment" from the Department's Branch of Energy and Minerals Assistance. Applts.App. at 112-14. In its written report, the Energy and Minerals Branch analyzed the various consequences that might result from the approval or disapproval of the Woods communization agreement. The report favored approval of the agreement, concluding that if the agreement was approved, the Indian lessors would "immediately receive" $384,675.74 in accrued royalties and interest from production from the unit well. Id. at 114. Contrary to the majority's characterization, the report did not find that, if the Woods communization agreement was disapproved, the Indian mineral owners would "forfeit" these royalties. Maj. op. at 1036. Instead, the report noted that there might be some question as to who was entitled to the escrowed funds. See Applts.App. at 114 (noting that, if the Woods agreement was disapproved, "[t]he Indian mineral interests will no longer be considered under lease to Woods" and that "[t]his raises the issue of who should receive the royalties currently in escrow"). The report also stated that if the Woods agreement was not approved, the prospect of re-leasing the Indian tracts was "not very good" and "even if a large bonus were received, the prospect of receiving future royalties from production is not guaranteed." Applts.App. at 117.
 
 
 74
 The Deputy Assistant Secretary then appropriately, and in my view necessarily, invited the Indian mineral owners and Woods to respond to this report. Indeed, because there is no indication that the Indian owners were notified of the Corporation Commission proceedings, the Interior Department proceedings may have been the only chance for these Indian owners to be heard regarding their position as to the proper development of their mineral interests.
 
 
 75
 The Indian owners filed a response disputing the report's conclusions. They challenged the conclusion that future leasing prospects were "not very good," stating, "There does exist a potential lessee who is willing to lease the mineral interests of the Indian owners and pay bonus monies in excess of $400,000.00." Applts.App. at 119. They added:
 
 
 76
 The potential lessee is fully aware of any possible litigation occurring in the Federal Courts and the Secretary may rest assured that a valid oil and gas mining lease will be entered into by and between the potential lessee and the Indian mineral owners immediately upon the disapproval of the Communization Agreement and the invalid leases with Woods Petroleum Company.
 
 
 77
 Id.
 
 
 78
 The Indian mineral owners also maintained that, if the Woods agreement was disapproved such that new leases could be negotiated, they would seek to join their mineral interests to the rest of Section 17 of Custer County through a subsequent communization agreement. They argued that under such an agreement they would be entitled to a proportional share of the revenues from the unit wells from the date of first production and cited a decision, Samedan Oil Corp. v. Cotton Petroleum Corp., 466 F.Supp. 521, 525 (W.D.Okla.1978), which upheld a communization agreement governing Indian land that had been given retroactive effect to the date of first production. Applts.App. at 122.
 
 
 79
 Finally, the Indian owners argued that, under principles established in several oil and gas decisions, the disapproval of the Woods agreement also entitled them (as owners of unleased tracts) to working interest revenues from the date of first production in Section 17. Under this theory, the Indian owners estimated that they would be entitled to approximately $1,920,000. Applts.App. at 119, 123-24. Woods filed a response agreeing with the report of the Energy and Minerals Branch and disputing the analysis of the Indian mineral owners. Applts.App. at 126-27.
 
 
 80
 These documents from the administrative proceedings demonstrate that, at the time that the Assistant Secretary issued his final decision in May of 1986, there was conflicting evidence before him as to whether approval of the Woods agreement was in the best interests of the Indian mineral owners. The submissions from the Energy and Minerals Branch of the BIA and from the Indian mineral owners establish that reasonable arguments could be made both in support of and in opposition to the Woods communization agreement. However, in light of the majority's characterization of the disapproval of the Woods agreement as an unreasonable, arbitrary, and capricious act, it should be noted that the report of the Energy and Minerals Branch (which recommended approval of the agreement) turned out to be incorrect about one important factor: just as the Indian mineral interest owners reported, a new lessee was available and did pay a $400,000 bonus to lease the subject allotted tracts. In any event, in his final decision for the Interior Department, although the Assistant Secretary referred to the initial recommendation of the Department's Minerals Management Service that the unit proposed by the Woods agreement was economically and geologically proper, he found that the $400,000 bonus that the Indian lessors could obtain if new leases were negotiated made disapproval of the agreement in their best economic interest.
 
 
 81
 As to this particular finding of the Assistant Secretary, my disagreement with the majority concerns the application of the requirement that agency officials must consider the relevant factors. Following Cotton Petroleum, the majority focuses on the Interior Department's final written decision and seems to require an item-by-item discussion of each factor articulated in the BIA guidelines. If that is what the relevant factors requirement entails, then I would agree that the Assistant Secretary did not satisfy it here. In particular, his May 1986 decision does not discuss one of the BIA factors at all: the lessees' compliance with the terms of the underlying leases. In addition, aside from a brief reference to the Minerals Management Service's conclusion that the proposed unit was geologically and economically proper, the decision does not discuss geological, engineering, and technical aspects of the agreement.
 
 
 82
 However, in my opinion, the applicable law does not and should not require the official to itemize "each and every factor discarded as well as the factors taken into account in order to reach a reasoned decision." Cotton Petroleum, 870 F.2d at 1531 (McKay, J., dissenting). In fact, the decisions on which the majority relies distinguish between an agency's duty to consider factors in making a decision and its duty to articulate the reasons for a particular decision. As to the first of these duties, a court may examine the entire administrative record in order to determine whether the relevant factors have been considered. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823-24, 28 L.Ed.2d 136 (1971); cf. United States v. Morgano, 39 F.3d. 1358, 1373 (7th Cir.1994) ("Because the statutes and Guidelines only mandate the sentencing court to 'consider' the relevant factors, the district court is under no obligation to enter specific findings as to each factor. The record must merely indicate the court considered the statutory factors, in general, in arriving at the fine.").
 
 
 83
 In contrast, the agency's duty to articulate its reasoning applies to its final decision. In order to satisfy this duty, an agency need only provide "a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.' " Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, 103 S.Ct. at 2866 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). Under this requirement, a court may uphold a decision "of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc., v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).
 
 
 84
 I believe that the majority errs in requiring the final decision-maker to engage in a factor-by-factor discussion of each relevant factor regarding the evaluation of a communization agreement. Significantly, in Kenai, the only case in our communization trilogy in which we affirmed an Interior Department decision regarding a communization agreement and the first of these cases in which we applied the relevant factors requirement to agency evaluations of such agreements, we did not require such a factor-by-factor discussion. Instead, we deemed sufficient the BIA Superintendent's testimony that the leases underlying the proposed agreement could be renegotiated for higher royalty payments and bonuses if the agreement was disapproved. Kenai, 671 F.2d at 387.[1]
 
 
 85
 In this case, the best-interest analysis requested by the Deputy Assistant Secretary, the responses to that analysis from the Indian mineral owners and Woods, and the Assistant Secretary's explanation of the grounds for his decision clearly demonstrate that the Interior Department considered the relevant factors in making its final decision. Indeed, a review of the report of the Energy and Minerals Branch, which the Deputy Assistant Secretary specifically requested in order to assist in the decision regarding the Woods communization agreement, indicates that a wide variety of factors were considered and discussed, including: the market for negotiating new leases if the Woods agreement was disapproved, drainage of the allotted tracts from unit wells, the amount of royalties that the Indian owners would receive from the proposed unit, the possibility of litigation, and the amount of production from wells drilled within the proposed unit. Applts.App. at 114-17. Moreover, the Indian lessors' response to this report (which the Deputy Assistant Secretary also requested) discusses many of these same factors. Id. at 118-25.
 
 
 86
 Although the Assistant Secretary did not discuss many of these specific factors in his final May 1986 decision, I simply do not think that he was required to do so. Moreover, the discretion as to whether to approve the agreement was his and not his subordinate's, and as long as he gave a reasoned explanation of his decision, he was free to disagree with the conclusions reached in the report of the Energy and Minerals Branch of the BIA. By explaining, after thorough review, that he deemed it to be in the best interests of the Indian owners to disapprove the Woods agreement and to allow negotiation of new leases and the payment of a $400,000 bonus, I find that he sufficiently articulated a reasoned basis for his decision that was not arbitrary, capricious, or an abuse of discretion. The majority's decision to the contrary bodes ill for our future review of administrative decisions, for it suggests that agencies may be required to engage in factor-by-factor discussions not required by their own guidelines or by our prior cases.
 
 
 87
 Moreover, in my judgment, the record evinces the kind of comprehensive scrutiny that modern federal Indian policy requires. Acting pursuant to a statute (25 U.S.C. Sec. 396d) passed, in part, to increase Indian authority over mineral leases and protect Indians' economic return on their property, Assiniboine & Sioux Tribes, 792 F.2d at 796, the Assistant Secretary reached a decision that comports with those aims.
 
 E. Other Indications of Unreasonableness
 
 88
 The majority also focuses on two other elements of the Assistant Secretary's decision that it finds unreasonable, arbitrary, and capricious. First, the majority notes that after disapproving the Woods communization agreement in May 1986, the Assistant Secretary approved an "identical" communization agreement submitted by the new lessee of the Indian tracts, Tomlinson Properties, Inc., in September 1986. Maj. op. at 1040. Moreover, the majority notes, the Assistant Secretary made the Tomlinson agreement retroactive to September 1982, the date of first production in section 17 of Custer County. In my judgment, neither of these decisions regarding the Tomlinson agreement renders the Assistant Secretary's actions unreasonable, arbitrary, or capricious.
 
 
 89
 In finding that approval of the Tomlinson communization agreement indicates that the Secretary acted improperly in assessing the Woods agreement, I think that the majority ignores the applicable regulations, the BIA guidelines, and the Secretary's fiduciary obligations. 25 U.S.C. Sec. 396d, 25 C.F.R. Sec. 212.24(c), and the BIA regulations focus on decisions as to particular agreements and plans. The decision that Sec. 396d and Sec. 212.24(c) authorize the Secretary to make, and for which the BIA has established guidelines, concerns whether a specific agreement or plan is in the best interests of the Indian lessors. As the district court observed, the decision is not whether the tracts in question should ever be communitized, but whether a particular agreement or plan should be approved. Applts.App. at 326.
 
 
 90
 In this case, although the Woods agreement and the Tomlinson agreement both organized the same tracts into a unit, they had different economic effects. The Woods agreement, if approved, would have extended lease nos. 14-20-205-7048, 14-20-205-7049, and 14-20-205-7050. In contrast, the Tomlinson agreement was submitted after the Woods leases had expired and after the subject allotted tracts had been re-leased for a substantial bonus. In treating these two agreements differently, the Assistant Secretary did what his fiduciary responsibilities, Kenai, and Cheyenne-Arapaho authorize him to do: he considered the economic aspects of particular agreements in making his decision. To say, as the majority does, that the Woods agreement and the Tomlinson agreement were "identical," is to ignore their differing effects on the very individuals whose interests should be a touchstone to both the Secretary's and this court's analysis.
 
 
 91
 As to this issue, I also do not believe that Cotton Petroleum supports the majority's reasoning. In that case, the Assistant Secretary disapproved a proposed communization agreement in one respect (so that the underlying lease would expire) and then approved the same agreement so that the Indian mineral owner could participate in the proposed unit. In the instant case, the Assistant Secretary did not simultaneously approve and disapprove the Woods agreement or the Tomlinson agreement. Rather, he evaluated the two agreements differently because of their contrasting economic effects on the Indian owners.
 
 
 92
 Finally, I do not find the Assistant Secretary's decision giving the Tomlinson agreement retroactive effect to be arbitrary, capricious, or unreasonable. Upon the disapproval of the Woods communization agreement, the subject allotted tracts became unleased for the period from February 1982 (the end of their primary terms) until the execution of the Tomlinson leases in May 1986. However, several wells had been completed on adjacent tracts, and in its report to the Assistant Secretary, the Energy and Minerals Branch found that the allotted tracts at issue here were subject to drainage. Applts.App. at 114. By giving the Tomlinson agreement retroactive effect, the Assistant Secretary allowed the Indian owners to participate in production from wells that, according to the record before him, had drained oil and gas reserves from their allotted tracts.
 
 
 93
 Rather than "demonstrating the arbitrariness of his action," maj. op. at 1040-41, the decision giving the Tomlinson agreement retroactive effect is one that is frequently made in analogous circumstances by officials responsible for regulating oil and gas production. See, e.g., Shearn v. Ward Petroleum Corp., 808 F.Supp. 1530, 1534 (W.D.Okla.1992); Texaco, Inc. v. Industrial Comm'n, 448 N.W.2d 621 (N.D.1989); Roberts v. Funk Exploration, Inc., 764 P.2d 147 (Okla.1988); Bennion v. Utah State Bd. of Oil, Gas, & Mining, 675 P.2d 1135, 1142 (Utah 1983); Ward v. Corporation Comm'n, 501 P.2d 503 (Okla.1972). In deciding whether to make a particular agreement or order retroactive, the focus is often on whether it is equitable to afford mineral owners that benefit. See, e.g., Roberts, 764 P.2d at 148; Bennion, 675 P.2d at 1142. In turn, that inquiry requires an examination of whether there were other means available to the mineral owners to mine their interests during the period covered by the proposed agreement or order. Thus, if a spacing or pooling order prevented mineral owners from mining their interests themselves and if ongoing production on adjacent tracts has subjected their resources to drainage, courts have found it equitable to allow those owners to reap the benefits of production on adjacent tracts by means of a retroactive unitization agreement or order. See, e.g., Bennion, 675 P.2d at 1142; Ward, 501 P.2d at 507. On the other hand, if there were no legal impediments to the owners' mining of their own interests during the disputed period, then courts have refused to make agreements and orders retroactive. See, e.g., Cowling v. Board of Oil, Gas, & Mining, 830 P.2d 220 (Utah 1991).
 
 
 94
 For example, in Roberts, 764 P.2d at 148, the Supreme Court of Oklahoma held that the Oklahoma Corporation Commission acted properly by giving a spacing order retroactive effect in order to protect the correlative rights of certain royalty interest owners. The court noted that there had been protracted proceedings before the Corporation Commission prior to the entry of the order and that the royalty owners' tracts had been subject to drainage from the date of first production in the unit. Id.
 
 
 95
 In this case, from the initial approval of the Woods agreement in April 1982 until the agreement's final disapproval in May 1986, the Woods agreement and the underlying leases that it extended vested the right to develop the subject tracts exclusively in the working interest owners. Applts.App. at 3, 77, 81. Thus, by operation of the Woods agreement, the Indian owners were prevented from developing their own tracts independently. Moreover, from the commencement of the BIA's initial evaluation in 1982 (prior to the date of first production in the proposed unit), the Indian mineral owners consistently opposed the Woods agreement. Accordingly, just as in Roberts and analogous cases, affording the Tomlinson agreement retroactive effect was not an arbitrary, capricious, or unreasonable way for the Assistant Secretary to allow the Indian owners the benefits of production that the Energy and Minerals Branch had found to be derived, in part, from the mining of their interests through wells on adjacent tracts.
 
 F. Guidance for the Secretary
 
 96
 We granted rehearing in this case to clarify the standards under which the Secretary should evaluate communization agreements governing leases on Indian land. I do not believe that the majority's decision provides the necessary clarification.
 
 
 97
 The majority's holding is fact-specific. It concludes that the Secretary acts arbitrarily and abuses his discretion when he: (1) disapproves a communization agreement for the sole purpose of allowing underlying leases to expire and new leases to be negotiated, (2) approves a communization agreement for the newly negotiated leases that establishes the same unit area as the previously rejected agreement, and (3) allows Indian lessors to collect royalties retroactively to the date of first production. However, the majority reaches this conclusion without reversing or expressly limiting Kenai or Cheyenne-Arapaho. Thus, in approving or disapproving communization agreements, the Secretary presumably still has a duty to act as a fiduciary for the Indian mineral owners, to maximize their lease revenues, and to consider the benefits that may be obtained by the Indian owners if a communization agreement is disapproved and new leases are negotiated.
 
 
 98
 In light of the majority's holding, the Secretary is now in a precarious position. If he is presented with a communization agreement that operates to extend underlying leases, he must still consider whether it would be more beneficial to the Indian owners to allow the leases to expire and to negotiate new leases. If he does not consider the market value and marketability of new leases, he breaches his fiduciary duty under Cheyenne-Arapaho and the federal law that establishes his obligations to Indian mineral owners. However, if he determines that disapproval of the agreement and the negotiation of new leases is in the best interests of the Indian owners, then he may have acted unreasonably and arbitrarily under the majority's holding here. Moreover, under the majority's reasoning, whether the Secretary's disapproval of a communization agreement is unreasonable and arbitrary depends on a course of events that follows his initial decision and that the Secretary may not be able to predict. Thus, according to the majority, if a communization agreement is disapproved, new leases are negotiated, and a new communization agreement establishing the same unit area as the rejected agreement is submitted to the Secretary, his approval of the second agreement makes his disapproval of the first one unreasonable. However, if the Secretary disapproves an agreement and new leases are negotiated but, for reasons that the Secretary may not been aware of at the time of the disapproval, a new communization agreement is not submitted (or a substantially different communization agreement is submitted), then the disapproval of the first agreement apparently would pass the majority's reasonableness test. To make the reasonableness of the Secretary's decision dependent on future events deprives him of objective standards that might offer him some guidance as to whether he is making a proper decision at the time he is required to make it.
 
 
 99
 The need for such objective standards is illustrated by the history of this case. For over twelve years, beginning with the objections to the Woods communization agreement that the Indian owners first submitted to the Anadarko Area Director of the BIA, the parties have contested the issue of whether the Secretary and his delegates should approve the Woods communization agreement. Until the matter is finally resolved, lessees such as Woods and Tomlinson remain uncertain of their rights under the various mineral leases that they have negotiated. Royalty funds to which the Indian mineral owners are entitled remain in escrow, and Interior Department officials are caught between their fiduciary responsibilities to the Indian owners and limitations on those duties imposed by Cotton Petroleum and this case. By failing to offer the necessary guidance to the Secretary and those affected by his decisions, the majority's ruling leaves all of the interested parties uncertain as to their rights and responsibilities. I fear that more tortuous litigation will result.
 
 G. Conclusion
 
 100
 By requiring the Secretary to engage in a point-by-point analysis in which he must apparently afford all relevant factors equal weight when he evaluates a communization agreement, the majority deprives him of the discretion to consider his primary duty--the economic protection of Indian mineral owners. By significantly limiting the Secretary's ability to base his decision as to a particular communization agreement on its effect on underlying leases, the majority greatly diminishes the Secretary's ability to protect his charge. By failing to recognize the primary importance of protecting the economic rights of Indians, the court lets other mechanistic factors deprive the owners of these minerals of thousands of dollars. By second-guessing every aspect of the Secretary's judgment, the court undermines the generally established standard of review for administrative decisions, requiring of the Secretary a detailed analysis that we do not require of other agencies. Finally, by holding that the Assistant Secretary lacked the discretion to disapprove an eleventh-hour communization agreement, submitted a few days before the primary terms of the underlying leases expired, the court deprives the Indian mineral owners of a $400,000 bonus.
 
 
 101
 Where, as here: (1) the Secretary receives a communization agreement near the end of the primary term of a lease; (2) there is no evidence that Interior Department officials or the Indian mineral owners have prevented the lessees either from drilling on the subject tracts during the lease's primary terms or from submitting a communization agreement earlier in that primary term; (3) the Secretary receives evidence and arguments from all affected parties as to whether to approve or disapprove the proposed agreement; and (4) there is a finding that the Indian tracts have been subject to drainage from drilling on adjacent tracts during the period in which the Secretary's decision on whether to approve a particular agreement is pending, it is certainly not an abuse of discretion for the Secretary to disapprove the proposed communization agreement so that the Indian mineral owners may negotiate a more profitable series of leases. In this situation, it is also not an abuse of discretion for the Secretary to approve a second communization agreement governing the newly negotiated, more profitable leases and to give that second communization agreement retroactive effect so that the Indian owners may receive their proportionate share of minerals drained from their allotted tracts.
 
 
 102
 I would therefore affirm the decisions of the Assistant Secretary and the district court.
 
 
 
 [1]
 The leases contain a "commence drilling" clause and a "consent to unitization" clause. The "commence drilling" clause provides that:
 If the lessee shall commence to drill a well within the term of this lease, the lessee shall have the right to drill such well to completion with reasonable diligence and if oil or gas, or either of them, be found in paying quantities, this lease shall continue and be in force with like effect as if such well had been completed within the term of years herein first mentioned.
 The "consent to unitization" clause states that:
 The parties hereto agree to subscribe to and abide by any agreement for the cooperative or unit development of the field or area, affecting the leased lands, or any pool thereof, if and when collectively adopted by a majority operating interest therein and approved by the Secretary of the Interior....
 
 
 [2]
 The Oklahoma Corporation Commission is authorized "to establish well spacing and drilling units of specified and approximately uniform size and shape covering any common source of supply ... of oil or gas within the State of Oklahoma." Okla.Stat.Ann. tit. 52, Sec. 87.1(a) (West 1991). "The purpose, and usual effect, of pooling [i.e. designating spacing units] is to prevent the physical and economic waste that accompanies the drilling of unnecessary wells." Howard R. Williams and Charles J. Meyers, Oil and Gas Law, Vol. 6, Sec. 901 at 3 (1993)
 
 
 [3]
 During the pendency of this appeal, Interior escrowed the unit royalties attributable to the Indian tracts under the state-ordered spacing unit
 
 
 [4]
 The BIA explained that three wells had been drilled in the spacing unit, all on non-Indian tracts, but only one well was profitable. The profitable well was farthest away from the Indian tracts, whereas the two unprofitable wells were adjacent to the Indian tracts. Based on these production results, the BIA could give no assurance that a profitable well could be located on the Indian tracts
 
 
 [5]
 Section 211.21(b) provides:
 All such leases shall be subject to any cooperative or unit development plan affecting the leased lands that may be required by the Secretary of the Interior, but no lease shall be included in any cooperative or unit plan without prior approval of the Secretary of the Interior and consent of the Indian tribe affected.
 Section 212.24(c) provides:
 All leases issued pursuant to the regulations in this part shall be subject to a co-operative or unit development plan affecting the leased lands if and when required by the Secretary of the Interior.
 
 
 [6]
 Moreover, the Secretary's mere perfunctory recitation of one or more relevant factors does not constitute adequate consideration. Cotton Petroleum, 870 F.2d at 1525-26
 
 
 [7]
 In essence, the Secretary's actions in Cotton Petroleum permitted the Indians to take a fresh look at the value of their mineral interests while neither incurring additional expense nor heightened risk
 That the Secretary awarded retroactive benefits under the communization agreement provided further evidence of the fairness of the original agreement and the inconsistency--and hence arbitrariness--of the Secretary's action. Cotton Petroleum, 870 F.2d at 1527.
 
 
 [8]
 Our opinion in Cotton Petroleum underscored this crucial distinction to Kenai:
 [In Kenai ], the Secretary ... was not taking inconsistent positions as to whether the Indian lessor was in or out of the communization unit. Rather, the Secretary in Kenai refused to approve the communization agreement for any purpose. We were not faced there with a situation where the Secretary was seeking simultaneously to free the Indian lessor from the burdens of the communization agreement while retaining for the Indians its benefits.
 Cotton Petroleum, 870 F.2d at 1528 n. 4.
 
 
 [9]
 Further, the Secretary's order in the instant case appears improperly to have penalized Woods Petroleum for waiting "until the eleventh hour to submit a Communization Agreement for approval." Aplt.App. at 132. The Secretary noted that Woods Petroleum failed to commence drilling on the Indian land during the primary term of the lease, and thus "voluntarily assumed the risk not only that the Department might not act on the Agreement prior to the expiration of the leases, but that the Agreement might be disapproved." Id. However, the record establishes that Woods Petroleum submitted a fully-executed communization agreement to the Secretary, and had drilled a well in the state-ordered spacing unit, before the primary terms of the original 1977 leases were due to expire. Indeed, we explained in Cotton Petroleum that submission of a communization agreement to Interior prior to the expiration of the lease's primary term constitutes timely filing. Cotton Petroleum, 870 F.2d at 1523. Neither 25 U.S.C. Sec. 396d nor the regulations promulgated thereunder specify time restrictions for the Secretary's review of a proposed communization agreement. It is not unusual in oil and gas production for a lessee to drill the qualifying well, or execute a spacing unit agreement, near the end of the primary term of the lease. For instance, the lessee in Cotton Petroleum commenced drilling in the unit eighteen days prior to the expiration of the lease, whereas drilling commenced fifty-one days prior to the lease expiration date in the instant case
 
 
 [1]
 Moreover, the language of the BIA guidelines does not support the majority's requirement that the Interior Department's final decision-maker must engage in a factor-by-factor discussion in the document that sets forth his decision. The guidelines simply require that a written statement discussing the listed factors be prepared by the final decision-maker's subordinates--BIA Area Directors and Superintendents. As to the final decision reached by the Interior Department after an Area Director's or Superintendent's decision is appealed, the guidelines are silent as to the level of specificity with which the responsible agency official must discuss the various factors. Applts.App. at 93-94. I do not believe that the majority sufficiently explains the basis for extending the requirement to discuss specific factors beyond what the BIA guidelines require, particularly when the required factor-by-factor analysis has been conducted by a subordinate BIA official and is contained in the record that the final agency decision-maker reviews